**UNITED STATES of America, Plaintiff,**

v.

**Cedrick Marquet HUDSON; Joseph Cornell Whitfield; Antuan Duane Dunlap, Defendants.**

**Case No. 2:13–cr–00126–ODW–3.**

United States District Court, C.D. California.

Signed March 10, 2014.

Order Denying Reconsideration March 12, 2014.

Jay H. Robinson, Ausa–Office of U.S. Attorney, Los Angeles, CA, for Plaintiff.

Alyssa D. Bell, Federal Public Defenders Office, Los Angeles, CA, for Defendants.

## ORDER GRANTING MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT [92]

OTIS D. WRIGHT, II, District Judge.

### I. INTRODUCTION

" 'Lead us not into temptation,' " Judge Noonan warned. *United States v. Black,* 733 F.3d 294, 313 (9th Cir.2013) (Noonan, J., dissenting). But into temptation the Government has gone, ensnaring chronically unemployed individuals from poverty-ridden areas in its fake drug stash-house robberies. While undoubtedly a valid law-enforcement tool when employed to target or prevent demonstrated criminal enterprises, reverse stings offend the United States Constitution when used solely to obtain convictions.

The Court is mindful that fighting crime is undoubtedly an arduous task that the Executive Branch must endure. But as James Madison wrote in *The Federalist No. 51,*

> If angels were to govern men, neither external nor internal controls on govern-

ment would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.

The only way to effectively control the Government in this case and effectuate the due process that the Constitution demands is to dismiss this indictment which the ATF obtained against Defendant Antuan Duane Dunlap through outrageous government conduct. For the reasons discussed below, the Court accordingly **GRANTS** Dunlap's Motion to Dismiss the Indictment. (ECF No. 92.) Dunlap shall be **RELEASED** from custody **FORTHWITH** barring any other holds.

### II. FACTUAL BACKGROUND

To catch individuals suspected of engaging in home-invasion robberies, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Dan Thompson masquerades as a "cocaine courier who wishes to steal the cocaine he is expected to deliver" from a location in the Los Angeles area. (Aff. ¶ 4.) Special Agent Thompson, consistent with previous ATF reverse-sting operations, paints a picture of an all-too-easy stash-house robbery. He tells unwitting individuals a tale of bountiful harvests of 20 to 25 kilograms of "pure" cocaine being guarded by just a few individuals. The only problem: it's all a lie.

Special Agent Thompson's interaction with Defendants began around November 2012 when Los Angeles Police Department Task Force Officer Erik Shear informed ATF Special Agent Jason Moore that Defendant Cedrick Marquet Hudson had asked a confidential informant ("CI")

whether he knew of any good "come ups." (*Id.* ¶ 5.) At the hearing on this Motion, the Court questioned the Government whether the term "come ups" refers only to robbery opportunities. The Government conclusorily indicated that Moore and Thompson knew that Hudson meant robbery opportunities based on the context—whatever it was. It still remains a mystery how "come ups" only referred to robberies here—let alone a stash-house robbery. Further, Moore did not provide any background regarding the CI's interaction with Hudson; rather, Moore's recount starts with the appearance that Hudson approached the CI out of the blue.

After the CI contacted the ATF, the agents told the CI to tell Hudson that Special Agent Thompson wanted to meet with him. (*Id.* ¶¶ 6–7.) On December 20, 2012, the undercover agent met with Hudson and Defendant Joseph Cornell Whitfield at a restaurant in Gardena, California. (*Id.* ¶ 8.) The undercover agent explained the proposed robbery to Hudson and Whitfield and told them to let him know if they were not interested. (*Id.* ¶ 8(c).) The undercover agent described the scheme as "a once in a lifetime type thing.... [L]ike this is like the one. You know, the come up don't come around that often...." (Suppl. Opp'n Ex. 6, at 5, 13.) Special Agent Thompson said that he picks up two kilograms of cocaine from the nonexistent stash house, but he always sees 20 to 25 kilograms there. (Aff. ¶ 8(d).)

The undercover agent also asked if Hudson and Whitfield if they had "a crew ... a couple other homies" that could participate in the nonexistent robbery. (*Id.;* Suppl. Opp'n Ex. 6, at 20.) They said that they did. (Aff. ¶ 8(d).)

Special Agent Thompson further explained that there were usually two individuals guarding the fake stash house—one of which always carried a firearm.

(*Id.* ¶ 8(e).) Special Agent Thompson said that he usually picked up cocaine once a month and that he would find out two days before the pick-up where the imaginary stash house was located. (*Id.*)

The undercover agent proposed that he would be inside the nonexistent stash house during the robbery. (*Id.* ¶ 8(i).) He said that Hudson and Whitfield should empty his pockets and tie him up to make it look like the agent was also a victim. (*Id.*)

Special Agent Thompson asked if Hudson and Whitfield's associates "could handle it if something happened during the robbery (referring to someone getting shot)." (*Id.* ¶ 8(m).) They said that they could. (*Id.*) Thompson then stated that he had "a home girl like got a hook up at a rental car company" and volunteered to procure a getaway car and safe house. (*Id.* ¶ 8(n); Suppl. Opp'n Ex. 6, at 16.)

The undercover agent alluringly described the fictitious cocaine as "pure" and told Hudson and Whitfield that they would need to repackage it before distributing it. (*Id.* ¶ 8(g), (t).)

On January 10, 2013, the undercover agent, Hudson, Whitfield, and the CI met for a second time outside a coffee shop in Carson, California. (*Id.* ¶ 11.) Special Agent Thompson stated that the cocaine shipment would arrive later in the month. (*Id.* ¶ 11(f).) He also asked about the third member of the group, and Hudson and Whitfield said he—"Rowdy" or "Baby Rowdy"—was ready. (*Id.* ¶ 11(h).) Later in the meeting, Special Agent Thompson again referenced the third member of the group, saying that he wanted to meet him. (*Id.* ¶ 11(j).)

The undercover agent then told Hudson and Whitfield that the fictional drug traffickers would be guarding 20 to 25 kilograms of pure cocaine. (*Id.* ¶ 11(*l*).) The

group discussed the logistics of the robbery, including how Special Agent Thompson should leave the stash-house door unlocked. Special Agent Thompson inquired if Hudson and Whitfield "could get him anything (referring to a firearm)"; Whitfield said that he could. (*Id.* ¶ 11(u).)

On January 21, 2013, the undercover agent informed Hudson via telephone that the drug traffickers were in Mexico and that the cocaine shipment would arrive in early February. (*Id.* ¶ 12(a).) Hudson said that they were ready. (*Id.* ¶ 12(b).)

On January 30, 2013, Special Agent Thompson called Hudson to arrange a meeting with the third member of Hudson and Whitfield's crew at an undercover warehouse in Los Angeles, California. (*Id.* ¶ 14(a).) Hudson and Whitfield arrived and introduced Dunlap—a completely different person from the previously referenced "Rowdy" or "Baby Rowdy." (*Id.* ¶ 11(f).) The group then further discussed the details of the fake stash-house robbery.

The undercover agent again asked Whitfield if he could get him a little "strap," meaning a gun, and the agent said that he could pay Whitfield for it. (*Id.* ¶ 14(o).) Whitfield obliged. (*Id.*)

Hudson bragged to Thompson that Dunlap is a "jack-boy" and "robs banks and all that shit." (*Id.* ¶ 14(*l*), (n).) Dunlap also stated that he had robbed a Western Union by threatening an employee with a Taser and had robbed a Nix check-cashing establishment. (*Id.* ¶ 14(ss), (tt).) But at no point did Dunlap or the other Defendants indicate that they had previously engaged in home invasions or drug stash-house robberies.

On February 5, 2013, Special Agent Thompson again met with Hudson, Whitfield, Dunlap, and the CI at an undercover warehouse that was to serve as the safe house—a safe house provided by the Government. (*Id.* ¶ 15.) The undercover

agent had rented a minivan as a getaway vehicle. (*Id.* ¶ 15(c).) Hudson placed a rifle bag from his vehicle into the rental van. (*Id.* ¶ 15(f)-(g).) The bag contained a shotgun and revolver. (*Id.* ¶ 15(h).)

While the crew waited in a breakroom, Special Agent Thompson told them that they were "about to get these birds (meaning kilograms of cocaine)" and described the cocaine as " 'pure[,] pure ass coca ... this ain't like no bullshit cocaine, [*sic*] this is like cocaina.' " (*Id.* ¶ 15(o).) The agent then left the room, and Defendants were arrested. (*Id.* ¶ 15(p).)

On February 25, 2013, the Grand Jury indicted Defendants for alleged violations of 21 U.S.C. § 846 (conspiracy to possess cocaine with intent to distribute), 18 U.S.C. § 1951 (conspiracy to interfere with commerce by robbery), and 18 U.S.C. § 924(c)(1)(A) (using or possessing a firearm in furtherance of a drug-trafficking crime). Hudson was also charged with violating 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).

On January 28, 2014, Dunlap moved to dismiss the indictment due to outrageous government conduct. (ECF No. 92.) The Government timely opposed. (ECF No. 96.) On March 3, 2014, the Court held a hearing on the matter and took the Motion under submission. Both parties have since submitted supplemental briefing, which the Court has extensively reviewed. (ECF Nos. 104, 108, 109.)

## III. LEGAL STANDARD

The Fifth Amendment to the Constitution commands that "[n]o person shall ... be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. The Due Process Clause stands as a bar to the Government invoking judicial process to obtain a conviction when its conduct is "outrageous." *United States v. Russell*, 411 U.S. 423,

431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (Rehnquist, J.). The outrageous-government-conduct doctrine permits a court to dismiss an indictment when the Government engages in conduct "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991). Judicial scrutiny focuses solely on the government's actions—not the alleged actions of the criminal defendant. *United States v. Restrepo,* 930 F.2d 705, 712 (9th Cir.1991). The outrageous-government-conduct doctrine thus differs in that respect from an entrapment defense. *Id.*

■ There is no brightline test for determining whether to apply this doctrine. *United States v. Black,* 733 F.3d 294, 302 (9th Cir.2013). In *United States v. Bonanno,* 852 F.2d 434 (9th Cir.1988), the Ninth Circuit previously developed a multifactor inquiry to determine whether to dismiss an indictment for outrageous government conduct. The court held that the government's conduct is permissible when,

(1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

*Id.* at 437–38.

■ But in the most recent case on point, the Ninth Circuit disavowed rigid application of the *Bonanno* inquiry and subsumed it within a new multifactor rubric. *Black,* 733 F.3d 294, 304 n. 7 (9th Cir.2013) (rejecting the *Bonanno* factors as a "test"). The Ninth Circuit expounded

a new, totality-of-the-circumstances standard that a court must consider in assessing the outrageousness of the Government's conduct:

(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Id.* at 303. The burden, at least in reverse-sting cases like this one, is on the Government to establish that its conduct does not surpass due-process limitations. *Id.*

## IV.  DISCUSSION

Dunlap moves to dismiss the indictment due to outrageous government conduct, namely, the ATF's entirely fake stash-house scheme. In response, the Government contends that Dunlap manifested his propensity to commit robberies and admitted to engaging in "similar conduct in the past"—therefore justifying the reverse sting that the ATF employed. But the Court finds that the Government's extensive involvement in dreaming up this fanciful scheme—including the arbitrary amount of drugs and illusory need for weapons and extra associates—transcends the bounds of due process and renders the Government's actions outrageous.

### A.  Standing

■ Citing to *United States v. Emmert,* 829 F.2d 805 (9th Cir.1987), the Government contends that Dunlap lacks standing to challenge the indictment based on outrageous government conduct because he

was not the "actual target" of the Government's operation. The Government asserts that any issues Dunlap has with how he entered into the alleged conspiracy "lie solely with Hudson and Whitfield." (Suppl. Opp'n 4.)

*Emmert* is entirely distinguishable from this case. In *Emmert,* the Ninth Circuit affirmed the district court's denial of defendant Arriaga's motion to dismiss the indictment based on outrageous government conduct, holding that "Arriaga lacks standing to object to the government's activities in this case since he was never an actual target of the investigation." *Id.* at 811. The court noted that Arriaga had not previously been involved in the negotiations between the undercover agent and Emmert. *Id.* at 807. Rather, it appears that Emmert simply brought Arriaga into the picture of his own volition.

In contrast, the undercover agent in this case repeatedly asked Hudson and Whitfield whether they had "a couple other associates" who could partake in the fake stash-house robbery. (Aff. ¶ 8(d).) As the ruse wore on, the undercover agent continued to ask about the third member of Hudson and Whitfield's crew, asking several times to meet with him. When Hudson and Whitfield finally introduced Dunlap to the undercover agent, Dunlap was as much the "actual target" of the Government's dragnet operation as Hudson and Whitfield. Unlike the happenstance that led Arriaga to the Government in *Emmert,* it was the undercover agent's continual badgering to include more members in Hudson and Whitfield's crew that resulted in Dunlap's five-day involvement in this fictitious plan.

It is also curious how the Government argues that "[a]ny issues that [Dunlap] has regarding how he entered into the conspiracy lie solely with Hudson and Whitfield." (Suppl. Opp'n 4.) It is not clear how the Government believes Hudson and Whit-

field would be able to remedy the outrageous government conduct of which Dunlap was a victim. They do not have the power to dismiss the indictment. Neither is it likely that Dunlap has some sort of civil remedy against Hudson and Whitfield. Instead, Dunlap faces real prison time as a result of the Government's action. It would be a strange result to find that Dunlap could not challenge the actions of the sovereign that put him there.

The Court accordingly finds that Dunlap has standing to challenge the Government's conduct through this Motion to Dismiss the Indictment.

**B. Outrageous government conduct**

■ All of the factors the Ninth Circuit expounded in *Black* weigh in favor of dismissing the indictment for outrageous government conduct.

*1. Defendants' known criminal characteristics*

In assessing the outrageousness of the Government's conduct, the Ninth Circuit has stated that a court should consider "whether a defendant had a criminal background or propensity the government knew about *when it initiated its sting operation.*" *Black,* 733 F.3d at 304 (emphasis added).

Here, there is no indication that the ATF, Thompson, the LAPD, or the CI had any knowledge of Hudson, Whitfield, or—in particular—Dunlap's alleged "criminal background or propensity" prior to Thompson inventing the stash-house scheme. In fact, Dunlap did not even come into the picture until January 30, 2013—just five days before his arrest and long after the Government had begun laying out the stash-house ruse. Thompson asked Hudson and Whitfield repeatedly about the third member of their crew, and they initially told him they were bringing a

completely different person. Absent a crystal ball, it is therefore impossible for Thompson—or anyone else at the ATF—to have known the slightest details about Dunlap in advance of the January 30, 2013 meeting.

In *Black*, the Ninth Circuit confronted a similar situation where the special agent learned of the Defendants' alleged criminal backgrounds only after the agent invented the stash-house scheme. After iterating the known-criminal-conduct factor, the court stated that the later-supplied knowledge "mitigated to a large degree" the court's concerns. *Black*, 733 F.3d at 307. The court reasoned that the defendants' "repeated representations that they had engaged in related criminal activity in the past quickly supplied reasons to suspect they were likely to get involved in stash house robberies." *Id.*

But this Court's concerns are not so easily "mitigated" to any degree by Dunlap's braggadocio at the January 30, 2013 meeting. It makes little sense to justify the Government's capricious, stash-house scheme at its inception by what Thompson later learned about Dunlap. In a situation where an apparently experienced cocaine courier is boasting to some small-time crooks about the chance to hit the mother lode, it is only human nature that the individual is going to try to impress the courier with wild tales of past criminal conduct. In this case, there is no evidence that Dunlap actually robbed a Western Union or Nix. But even if he did, Thompson did not learn about Dunlap's alleged past crimes until after Dunlap joined the doomed-to-fail crew. The Government cannot bootstrap this *post hoc* knowledge to justify the scheme from the beginning.

Those commercial robberies also bear little upon the fictitious stash-house scheme or the home invasions the ATF sought to eliminate. In fact, when Dunlap was bragging about this past exploits, he disavowed any connection to drugs:

> [Dunlap]: Keep my ass clean. I never touch dope. I'm just saying though.
>
> [Whitfield]: He's a jack boy, he don't know nothing about no drugs.

(Opp'n Ex. 2 at 55.) So contrary to the Government's contention, Dunlap's "admissions" only served to demonstrate that he had no propensity to commit drug crimes—the entire subject of the reverse sting.

Allowing after-the-fact knowledge to mitigate the Court's concerns in a situation like this also creates a perverse incentive for the Government. It encourages the Government to cast a wide net, trawling for crooks in seedy, poverty-ridden areas—all without an iota of suspicion that any particular person has committed similar conduct in the past. And if the Government happens to get it right and catch someone who previously engaged in crime, the courts will place their imprimatur on the whole fishing expedition.

The Court declines the invitation to endorse this nab-first-ask-questions-later approach. While this situation is a win-win for the Government, it is really only lose-lose for the unwitting individuals unlucky enough to fall into the Government's net. If they have never committed criminal activity in the past but agree to participate in the fake robbery, they go to prison—unless they can surmount the Everest-like hurdle to establish an entrapment defense. And if they have criminal backgrounds, entrapment is likely off the table. *See United States v. McClelland*, 72 F.3d 717, 722 (9th Cir.1995) ("If the defendant is found to be predisposed to commit a crime, an entrapment defense is unavailable regardless of the inducement.").

If the Government were to actually have knowledge that a particular person had engaged in similar conduct in the past—or

at least had suspicion based on identifiable facts—then the Government should and does have free rein, consistent with constitutional restrictions, to go after those individuals. That's all that the first *Black* factor appears to ask for. *See* 733 F.3d at 304. But that advance knowledge is wholly lacking here, thus weighing in favor of an outrageous-government-conduct finding.

### 2. Individual suspicion of the defendants

The Ninth Circuit does not require that the Government have "individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation." *Id.* But if the Government has reason to suspect a person or identifiable group before launching a reverse sting, that is a relevant consideration. *Id.*

Dunlap points out that there is no evidence that he or the other Defendants were previously involved—or even suspected of being involved—in stash-house robberies. But the Government argues that Dunlap's admission that he had participated in other alleged robberies manifested a propensity to commit more robberies.

When the Eleventh Circuit considered a similar fictitious, stash-house-robbery scenario, the court confronted a situation where "ATF agents contacted individuals suspected of being involved in home invasions." *United States v. Sanchez,* 138 F.3d 1410, 1413–14 (11th Cir.1998). The court found that factor persuasive in finding no outrageous government conduct.

Here, too, the ATF sought to "investigate individuals suspected of being involved in home invasion robberies." (Aff. ¶ 4.) But not once did the ATF indicate that it suspected any Defendant of being associated with home invasions—even after Dunlap and the others started boasting about their past criminal conduct. At best, the ATF operated off a hunch that

Dunlap and the others were up to no good. But something more is required before the Government can ensnare individuals in an all-too-tempting, made-up robbery and take 15–plus years away from their lives.

While the Government contends that this case lacks the troubling factor of the informant trolling for targets in a bad part of town as occurred in *Black,* there is little evidence about what the informant actually did in this case. Moore only states in his affidavit that Hudson approached the CI. But Moore does not elaborate on how Hudson and the CI came into contact with each other, such as whether the CI initiated any contact or suggested that he might be a source for good "come ups." Dunlap proffers that there was a disagreement between Hudson and the CI, which led the CI to furnish this opportunity as a peace offering. In any event, the Government's lack of individualized suspicion is therefore not allayed by this missing page in the Government's story.

### 3. Government's role in creating the crime of conviction

The United States Supreme Court has drawn a line between infiltrating an ongoing criminal enterprise on one hand and manufacturing crime on the other. The Court stated that the "function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). While the Government may not create crime, the Court has accepted that "infiltration is a recognized and permissible means of investigation." *Russell,* 411 U.S. at 432, 93 S.Ct. 1637; *see also Black,* 733 F.3d at 305 ("Also relevant is whether the government approached the defendant initially or the defendant approached a government agent, and wheth-

er the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing.").

But for the undercover agent's imagination in this case there would be no crime. The undercover agent invented his drug-courier persona, the stash house, the 20 to 25 kilograms of cocaine supposedly inside the stash house, the two individuals supposedly guarding the stash, the need to use weapons, and the idea of robbing the stash house. He even provided the putative safe house and getaway van. Dunlap brought little to the table besides his sheer presence and perhaps the hope of being able to obtain some quick cash. He hardly took an "independent role in planning the crime" like the defendants did in *Black.* 733 F.3d at 306 n. 8. Rather, the most it appears he did was say, "I'm straight." (Aff. ¶ 14(cc).)

Despite the Supreme Court's admonition, the ATF manufactured this entire crime. It did not infiltrate an ongoing criminal enterprise, as there is no indication that Hudson, Whitfield, and Dunlap had any previous criminal affiliation between them. In fact, before the CI informed Thompson that Hudson was interested in "come ups," Defendants were not even on the ATF's radar. Total falsity concocted by the ATF was precisely one of the Ninth Circuit's concerns in *Black.* 733 F.3d at 303 ("Although [the defendants' actions in participating in the plan] clearly corroborate the defendants' intent to carry out an armed robbery, defendants were responding to the government's script."). That fiction is likewise one of this Court's misgivings and weighs in favor of dismissing the indictment.

### 4. Government's encouragement of the defendants to the commit the crime

A court must also consider the extent to which the Government encouraged the de-

fendant to commit the crime charged, "with mere encouragement being of lesser concern than pressure or coercion." *Id.* at 308.

At the hearing on the Motion, the Government argued that in *United States v. Shapiro,* 669 F.2d 593 (9th Cir.1982), the Ninth Circuit established that a defendant must offer "some evidence or persuasion *by someone who was a government agent*" in order for a court to give an entrapment instruction. *Id.* at 598 (emphasis added). The Government also contends that just like the defendants in *Black,* once the agent set his bait, Hudson and Whitfield responded without any further inducement—thereby demonstrating the Government's minimal role in the scheme.

The Government's reliance on *Shapiro* is misplaced. In that case, the court dealt with whether a district court should have given the jury an entrapment instruction. But Dunlap has not reached trial yet; the jury-instruction issue is therefore premature. Further, he moves to dismiss the indictment based on outrageous government conduct—not entrapment. And rightfully so. Entrapment is a jury issue, whereas outrageous government conduct is an issue for the Court. *Compare Sorrells v. United States,* 287 U.S. 435, 452, 53 S.Ct. 210, 77 L.Ed. 413 (1932), *with United States v. Williams,* 547 F.3d 1187, 1199 (9th Cir.2008).

While there may be no indication that the undercover agent or the CI threatened or otherwise coerced Defendants to enter into the conspiracy, one cannot turn a blind eye to the economic coercion inherent in a fake stash-house case like this. The Government essentially targets people who are poor and have distorted moral compasses. As Hudson commented in a postarrest interview, "[I]f you 'tell 3 broke dudes there's 20 birds [kilograms of cocaine], what do you think's gonna hap-

pen?'" (Mot. Ex. B.) Dunlap's "willingness" to participate is just as consistent with Dunlap being "broke" and in need of cash as it is with his "propensity to commit robberies"—let alone his propensity to commit home-invasion or stash-house robberies. (*See* Opp'n 8–9.)

An exchange between the undercover agent and Defendants on January 30, 2013, compellingly demonstrates the economic pressures Defendants faced, exacerbated by the Government:

> [Agent]: Yep, what do you always say, you ain't afraid of no money, right?
>
> [CI]: Yeah, I ain't afraid of no money.
>
> [Agent]: You ain't afraid of no cocaina are you? . . .
>
> Male: Hell yeah, it will change my life . . . .
>
> [Whitfield]: Sure, I'll never be broke again. My kid's gonna be straight . . . .
>
> [Whitfield]: I'm gonna buy property and everything, probably like five or ten years down the line, but it will be right.

(Opp'n Ex. 2 at 45.) With the Government dangling over $600,000 in front of clearly impoverished individuals, it is no surprise that they took the bait.

In a recent scholarly article, Professor Eda Katharine Tinto echoes the Court's concerns. She writes, "The inducements used to persuade suspects to commit, or simply to agree to commit, a serious and severely sentenced set of crimes elicits significant questions regarding the extent of the defendants' blameworthiness and the possibility that the mandatory sentence will be disproportional to any determination of culpability." *Undercover Policing, Overstated Culpability,* 34 Cardozo L.Rev. 1401, 1451 (2013). Professor Tinto's point is well taken. It is difficult to comprehend how a person like Dunlap deserves a 15–plus–year sentence for being part of an entirely fake robbery scheme for a mere five days—especially when the

extent of his involvement was merely to say, "I'm straight." (Aff. ¶ 14(cc).)

So while arm-twisting and extortionate threats would easily satisfy the government-coercion factor, so too should the Government hitting individuals like Dunlap where they are most vulnerable: their depressed economic circumstances. The Court consequently finds that this factor weighs in favor of an outrageous-government-conduct determination.

### 5. *Nature of the government's participation in the offense conduct*

In assessing the Government's participation in the crime alleged, the Ninth Circuit considers the duration, nature, and necessity of the Government's actions. *Black,* 733 F.3d at 308–09.

At the hearing, the Government repeatedly argued that it was Defendants who dragged the plan out for two months through their continued excitement to participate and contact with Thompson. But Moore's affidavit reveals a very different story. On January 7, 2013, Hudson called the CI's cell phone, but the CI ignored the call. (Aff. ¶ 10.) Rather, the CI sent Hudson a text message stating, "I'll be back in two days ill call u." (*Id.*) On January 21, 2013, speaking to Hudson on the telephone, Thompson "conveyed to HUDSON that the drug traffickers were still in Mexico and the shipment (of cocaine) would probably be coming sometime early in February." (*Id.* ¶ 12(a).) These statements demonstrate that Defendants did not call the shots when it came to timing; instead, they simply followed the undercover agent's lead and met him when he asked. The Government's drawn-out, two-month involvement in this fictitious stash-house scheme thus only weighs in favoring of dismissing the indictment. *See Black,* 733 F.3d at 308 (observing that Government participation of longer duration is "of

greater concern" than short-term involvement).

The Government also misapprehends the law. In assessing whether the Government has engaged in outrageous conduct, the focus is solely on the its actions—not the defendants. *Restrepo*, 930 F.2d at 712. It is therefore erroneous to justify this fake stash-house scheme based on what Defendants did or did not do.

The nature of the ATF"s conduct similarly tips the scales against the Government. In *Black*, the court noted that the undercover agent "provided no weapons, plans, manpower or direction about how to perform the robbery, even when the defendants sought his advice." *Id.* at 309. But here, the undercover agent provided a getaway van, putative safe house, and—most important of all—the entire scheme and its fictitious components. He also alleviated Defendants' logistical and safety concerns when he "proposed that he would be inside the stash house at the time of the robbery . . . ." (Aff. ¶ 8(i).)

Thompson also goaded Defendants to acquire weapons. He repeated several times over the course of the two-month ruse that "at least one of the individuals [guarding the nonexistent stash house] always carried a firearm." (*Id.* ¶ 8(e); 8(m) ("SA Thompson asked if HUDSON and WHITFIELD's associates could handle it if something happened during the robbery (referring to someone getting shot)."); 11(u) ("SA Thompson asked if they could get him something (referring to a firearm), and WHITFIELD indicated he could get SA Thompson a little .380."); 14(*o*) ("SA Thompson asked about WHITFIELD getting him a little 'strap' (referring to a firearm that was previously discussed) and SA Thompson offered to cash him out (meaning pay him for the firearm). WHITFIELD indicted [*sic*] he could get SA Thompson something."); 14(u) ("SA Thompson next mentioned that there was

always two individuals in the stash house and at least one of them was always armed, but as far as he knew, both could be armed."); 14(*ll*) ("SA Thompson later indicated that the occupants of the stash house may not go down very easy."); Opp'n Ex. 2 at 28 ("Like I said the one fool he is always strapped, but the other dude I think he might be, I just don't know.").) With Thompson continually sounding the war horn, it is not surprising that Defendants showed up to the final meeting with two weapons.

The undercover agent's continued participation, assurances, and suggestions over the course of the two-month period made him "a partner in the criminal activity" rather than a mere "observer." *See Black*, 733 F.3d at 308. His input was likewise "necessary" for Defendants to carry out their doomed plan, since but for Thompson's imagination, there would have been no fictitious stash-house robbery to begin with—let alone the need for guns and extra associates. *See id.* at 309.

In these stash-house cases, the Government's "participation in the offense conduct" is what makes them particularly repugnant to the Constitution. Everything about the scheme—and therefore almost everything bearing upon a defendant's ultimate sentence—hinges solely on the Government's whim. Why were there not 10 kilograms in the stash house? Or 100? Or 1,000? Why were the guards allegedly armed—necessitating that Defendants bring weapons along with them? All of these factors came down to the ATF and the undercover agent alone. That sort of arbitrariness offends the Constitution's due-process demands. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 127 n. 10, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("[T]he Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary

exercise of the powers of government . . . ." (citation omitted) (internal quotation marks omitted)); *Black*, 733 F.3d at 317 (Noonan, J., dissenting) ("[I]t is a violation of due process for sentences to be at the arbitrary discretion of the ATF.").

The Ninth Circuit has also remarked that these fake stash-house cases draw dangerously close to another criminal justice issue: sentencing entrapment. The court stated,

> In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs. The ease with which the government can manipulate these factors makes us wary of such operations in general, and inclined to take a hard look to ensure that the proposed stash-house robbery was within the scope of [the defendant's] ambition and means.

*United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir.2010) (citation omitted). In fact, the Ninth Circuit was so concerned with sentencing entrapment in stash-house cases that the court formulated a specific test to apply in these scenarios: "in the case of fictitious stash house robberies, the defendant need only show a lack of intent *or* lack of capability to deal in the quantity of drugs charged" to establish sentencing entrapment. *United States v. Yuman–Hernandez*, 712 F.3d 471, 474–75 (9th Cir. 2013), *cert. denied*, —— U.S. ——, 134 S.Ct. 261, 187 L.Ed.2d 191 (2013).

While case law has thus made it slightly easier for a defendant to establish a sentencing-entrapment defense, the defense only comes into play if a defendant rolls the dice and goes to trial. In this Court's own experience with these fictitious stash-house cases, that is not a likely scenario. With the capriciously selected amount of drugs, a defendant has the proverbial Sword of Damocles hanging over his head. He is not likely to let it fall and face the considerable prison time that surely awaits him if he loses at trial—especially when the Government has spent, like in this case, months recording conversations inculpating him in the trumped-up conspiracy.

It is also no accident that the ATF selects the amount of drugs that it does. If a defendant is convicted of possessing five kilograms or more of cocaine with intent to distribute, he faces a 10–year mandatory-minimum sentence. 21 U.S.C. § 841(b)(1)(A). The defendant also faces another five years imprisonment for possessing a firearm in connection with a drug-trafficking offense. 18 U.S.C. § 924(c)(1)(A). Twenty to twenty-five kilograms in the fake stash house puts the defendant at a base offense level of 34, U.S.S.G. § 2D1.1(5), (c), with an upward adjustment of two for possessing a dangerous weapon in connection with the offense, *id.* § 2D1.1(b)(1). A fake stash-house defendant with a criminal-history category of one—a very unlikely scenario—therefore faces about 15 to 20 years' imprisonment for a crime entirely dreamed up by the Government.

At the hearing on the Motion, the Government proffered a rather curious justification for the arbitrary drug amount the undercover agent selected. The Government argued that based on Special Agents Moore and Thompson's training and experience, the 20 to 25 kilograms at issue is commensurate with real stash houses in the Southern California area. Thompson had to select this amount in order to establish his credibility as a purported drug

courier—the amount being within the "realm of reality" for people "in this line of work" per the Government.

But the Government's rationalization is hopelessly circular. The Government seeks to prosecute Dunlap for a fake crime it cut from whole cloth. To justify the serious sentence Dunlap faces as the result of its imagination, the Government attempts to use its creation of the crime, including the need to establish the undercover agent's credibility, as the validation for the amount of drugs. The amount of drugs then justifies the sentence. But since the Government created each necessity and justification, the sentence no longer bears a proportional relationship to the defendant's culpability—just the Government's imagination. Something more than mere bootstrapping is needed for the Government to take 15–plus years away from Dunlap's life.

The Government's argument also proves the problem with this whole scheme. The Government asserts that it dreams up these stash-house robberies to catch people inclined to commit home invasions. But the Government must make the robbery scheme tempting enough to nab a potential criminal. The Government thus sets the drug amount at a level apparently it knows that no poverty-ridden individual could pass up. So the Government essentially admits that this ruse is not meant to simply skim off those individuals likely to commit similar crimes; rather, it is designed to never fail. And the high number of fake stash-house convictions the Government has attained confirms this strategy.

The Court thus finds that the Government's extensive, essential participation in the offense conduct in this case tips the scales of justice in Dunlap's favor. Society does not win when the Government stoops to the same level as the defendants it seeks to prosecute—especially when the Government has acted solely to achieve a conviction for a made-up crime.

### 6. Nature of the crime being pursued and necessity for government's actions

Zero. That's the amount of drugs that the Government has taken off the streets as the result of this case and the hundreds of other fake stash-house cases around the country. That's the problem with creating crime: the Government is not making the country any safer or reducing the actual flow of drugs. But for the Government's action, the fake stash house would still be fake, the nonexistent drugs would still be nonexistent, and the fictional armed guards would still be fictional. *See Black*, 733 F.3d at 302–03 (finding the Government's entire fiction to be "troubling"). Instead, the Government comes close to imprisoning people solely because of their thoughts and economic circumstances rather than their criminal actions.

Reverse stings actually serve to benefit real stash-house operators. As the famed Law and Economics jurist Judge Richard Posner observed,

The effect of a fictitious stash house sting, when the person stung is … a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses—security obtained at no cost to the operators of stash houses—reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business's costs, the lower the prices charged con-

sumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would pay law enforcement to sting potential stash house robbers. *United States v. Kindle*, 698 F.3d 401, 416 (7th Cir.2012) (Posner, J., concurring and dissenting), *reh'g en banc granted*, opinion vacated (Jan. 16, 2013), *cert. denied*, —— U.S. ——, 133 S.Ct. 1743, 185 L.Ed.2d 800 (2013).

But these stash-house cases do cost someone money: federal taxpayers. As of the date of this Order, there are 215,566 inmates in federal detention. Statistics, Federal Bureau of Prisons, http://www.bop.gov/about/statistics/population—statistics.jsp (last visited Mar. 10, 2014). According to the Bureau of Prisons, the average cost to incarcerate a federal inmate in 2011 was $28,893.40. Annual Determination of Average Cost of Incarceration, 78 Fed.Reg. 16711, 16711 (Mar. 18, 2013). In fictitious stash-house cases, the ATF usually seeks a 15–year sentence. *Black*, 733 F.3d at 317 (Noonan, J., dissenting). These fake robberies therefore cost federal taxpayers approximately $433,401 per defendant in incarceration costs alone—not to mention investigative, prosecutorial, defense, and judicial resources. That number only continues to skyrocket if a defendant is subject to a higher criminal-history category and aggravating factors.

Society must question whether the astronomical cost associated with prosecuting fake crime is worth it. In a recent *Wall Street Journal* article, United States District Judge Michael A. Ponsor remarked, "Today, we imprison more of our people than any other country in the world.... Either our fellow Americans are far more dangerous than the citizens of any other country, or something is seriously out of whack in the criminal justice system." Hon. Michael A. Ponsor, *The Prisoners I Lose Sleep Over*, The Wall Street Journal, Feb. 12, 2014. When the nation imprisons people solely because the Government dreams up a too-good-to-turn-down robbery and then targets people it knows are eager to make an easy buck, Judge Ponsor's concerns are only further borne out.

The Court in no way decries all reverse-sting operations as a matter of law. Used properly, they can be a powerful tool for law enforcement to catch dangerous individuals plotting serious crime before they succeed and harm others. But when the goal of the reverse sting becomes landing convictions alone, the Government loses the justification for employing this crime-fighting tool. Wherever the line is drawn, this case falls on Dunlap's side. Due process demands that much.

### C. Inherent supervisory power

■ In his Motion, Dunlap also mentions another, alternative basis for the Court dismissing the indictment: the Court's inherent supervisory power. The Court may exercise this power for three reasons: "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991); *see also United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). But neither Dunlap nor the Government fully briefed this issue, so the Court declines to opine whether its supervisory powers likewise warrant dismissing the indictment in this case.

### V. CONCLUSION

The Court is mindful of the Supreme Court's admonition in *Russell*: the federal judiciary does not have "a 'chancellor's

foot' veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." 411 U.S. at 435, 93 S.Ct. 1637. The Executive Branch's enforcement obligation is certainly a difficult one, as people will always find new ways of evading law-enforcement detection and carrying out their criminal enterprises. This ever-shifting landscape demands that law-enforcement agencies employ creative tactics to ferret out crime and keep society safe.

But it is not the role of the Judicial Branch to merely rubberstamp whatever imaginative device the ATF and other agencies dream up. Rather, it is the duty of the courts "to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." *The Federalist No. 78* (Alexander Hamilton).

The time has come to remind the Executive Branch that the Constitution charges it with law enforcement—not crime creation. A reverse-sting operation like this one transcends the bounds of due process and makes the Government "the oppressor of its people." 733 F.3d at 318 (Noonan, J., dissenting). In this case, the Constitution will not tolerate subjecting an individual to prosecution for an imaginary crime subject to a very real punishment—a punishment which rests entirely on ATF agents' whims. Since it is the Court's sworn duty to uphold the Constitution, the Court **GRANTS** Dunlap's Motion to Dismiss the Indictment. (ECF No. 92.) Dunlap shall be **RELEASED** from custody **FORTHWITH** barring any other holds.

**IT IS SO ORDERED.**

## ORDER DENYING MOTION FOR RECONSIDERATION OF THE COURT'S ORDER RELEASING DEFENDANT FORTHWITH [114]

Finding that the Government had engaged in outrageous conduct in implicating Defendant Autuan Duane Dunlap in a fictitious stash-house ruse, the Court dismissed the indictment on March 10, 2014. (ECF No. 112.) The Court ordered that Dunlap be released forthwith, and Dunlap was released that same day. In response, the Government immediately filed a Notice of Appeal and this Motion for Reconsideration of the Court's Order Releasing Defendant Forthwith. (ECF Nos. 113, 114.) The Government asks the Court to reconsider its release Order in light of the Criminal Appeals Act, 18 U.S.C. § 3731, which incorporates provisions of the Bail Reform Act of 1984, §§ 3141–56. But since the Court finds that there is no legally operative charging document upon which it could possibly detain Dunlap, the Court **DENIES** the Government's Motion. (ECF No. 114.)

The Government argues that since it filed a Notice of Appeal as authorized by § 3731,[1] the Court must determine Dunlap's detention under § 3142. *See* § 3143

---

1. Curiously, the Government has both filed a Notice of Appeal and then asked the Court to at least stay the order releasing Dunlap forthwith until the Solicitor General determines whether the United States Attorney's Office should pursue an appeal of this Court's dismissal Order. The Government also cites to an article in the *United States Attorneys' Bulletin,* which states that Department of Justice attorneys need the Solicitor General's approval before pursuing, among others, an appeal of a court's order dismissing an indictment. But the Court need not resolve whether the Government's Notice of Appeal was effective, as either way, the Court finds that it may not hold Dunlap without a live charging document.

("The judicial officer shall treat a defendant in a case in which an appeal has been taken by the United States under section 3731 of this title, in accordance with section 3142 of this title, unless the defendant is otherwise subject to a release or detention order."). The Government asserts that this Court's Order Dismissing the Indictment for Outrageous Government Conduct is "legally irrelevant for the purposes [of] detention" because the Magistrate Judge already determined that Dunlap should be detained under § 3142. (Mot. 5.)

Further, the Government contends that Dunlap has not rebutted the twin presumption in favor of detention that arose under § 3142(e) due to Dunlap being charged with an offense subject to a maximum imprisonment term of 10 years or more as prescribed under the Controlled Substances Act. § 3142(e)(3)(A). That is, Dunlap has not refuted the presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e). The Government therefore requests that the Court issue a bench warrant to re-arrest Dunlap.[2]

But Dunlap contends that the Court's Order Dismissing the Indictment for Outrageous Government Conduct falls under the proviso of § 3143, i.e., the Court need not wade through § 3142's thicket, because "the defendant is otherwise subject to a release or detention order." § 3143(c). Case law has yet to fully explicate when a court should apply § 3143(c)'s proviso. One court construed the exception and found that the "court is not **required** to conduct a detention hearing when a release or detention order is otherwise in

effect. However, when the court does consider detention issues following an appeal by the government, such consideration should be under the provisions of 18 U.S.C. § 3142." *United States v. Shareef,* 907 F.Supp. 1481, 1483 (D.Kan.1995); *see also United States v. Szpyt,* 2:11–CR–228–GZS, 2013 WL 4039412, at *2 (D.Me. Aug. 7, 2013).

In its Reply, the Government offers a sensible interpretation of the clause. It asserts that the Court should construe "release order" under § 3143(c) to coincide with the requirements of a release order under § 3142(h). The latter subsection requires a judicial offer to issue a written statement setting forth the conditions of release and advising the person of the penalties for violating the provisions. Since this Court's Order Dismissing the Indictment did not enunciate the elements listed in § 3142(h), the Government contends that the Court's Order does not qualify for the release-order exception under § 3143(c).

The Government correctly points out that the Court's Order Dismissing the Indictment for Outrageous Government Conduct does not touch upon § 3142(h)'s elements. And for good reason. Since there is no longer an operative indictment, there is no possible way for the Court to further restrain Dunlap's liberty.

▆▆▆▆ It is a fundamental precept of the federal criminal justice system that generally "[n]o person shall be held to answer" for a crime "unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The Grand Jury serves another important constitutional function: ensuring that a person is not subject to seizure except upon a determination that

**2.** In its Reply, the Government withdrew its alternative request asking the Court to stay execution of its release order, as Dunlap's release from federal detention has rendered this issue moot. (Reply 1–2.) The Government instead requests that the Court issue a bench warrant for Dunlap's arrest.

there is probable cause that he has committed a criminal offense. *Id.* amend. IV. While the Government has presented an extensive discussion of § 3142, that section—by its very terms—only applies to "a person charged with an offense." § 3142(a). When the Court dismissed the indictment, Dunlap was no longer "charged with an offense."

Neither does the Court find that § 3143(c) compels a different result. This case presented an unsettled interplay between the Criminal Appeals and Bail Reform Acts—it even appears to be an issue of first impression. A literal reading of § 3143 might seem to indicate that the Court must navigate the § 3142 morass to determine whether to release Dunlap. Section 3143 states that the "judicial officer *shall* treat a defendant in a case in which an appeal has been taken by the United States under section 3731 of this title, in accordance with section 3142 of this title." § 3143(c) (emphasis added). The Government has in fact appealed—or at least will likely appeal—the Court's Order Dismissing the Indictment as authorized under § 3731. That would seem to trigger mandatory application of § 3142.

But as noted above, there is no possible way that the Court could apply § 3142 to Dunlap at this time, because there is no valid indictment against him. *See* § 3142(a) (requiring that the person be charged with a crime). The Government asks the Court to issue a bench warrant to re-arrest Dunlap. But on what charge? It would run completely afoul of the Constitution for the Court to simply order that a person sit in jail because at some unknown point in the future an appellate court might reverse the court order that dropped the charges against him.

This is not the first time that a court has considered whether to detain a person following an appeal by the Government under § 3731. Many courts have addressed the

issue after they suppressed incriminating evidence, finding that the evidence could not trigger § 3143(e)(3)'s presumption in favor of detention. *See, e.g., United States v. Barner,* 743 F.Supp.2d 225, 228 (W.D.N.Y.2010); *United States v. Jay,* 261 F.Supp.2d 1235, 1239–40 (D.Or.2003); *United States v. Shareef,* 907 F.Supp. 1481, 1484–85 (D.Kan.1995).

There are cases in which courts have found that the cost-benefit analysis expounded by the United States Supreme Court in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), weighs in favor of using suppressed evidence to evaluate pretrial detention under § 3142. *See, e.g., United States v. Fulgham,* CR 12–0124 CW KAW, 2012 WL 2792439, at *1 (N.D.Cal. July 9, 2012); *United States v. McCarty,* CR. 08–00513 JMS, 2009 WL 5061577, at *3 (D.Haw. Dec. 24, 2009); *United States v. Ailemen,* 165 F.R.D. 571, 572–73 (N.D.Cal.1996). But all of those cases are distinguishable because the defendants were still subject to an operative charging document—quite unlike Dunlap.

█ The court's reasoning in *Barner* is persuasive. In that case, the district judge concluded,

> [T]he government suggests that the court "must assess the bail factors present in this case as it would in the first instance (i.e., as though there were no suppression rulings or government appeal pending)". I disagree. In determining whether defendant's motion should be granted, my focus is not on whether the previous orders of detention were proper when made, *but whether detention continues to be warranted at this time.* The [Bail Reform Act], by its nature, is always looking forward. To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but

the Government needs to show that there is a serious risk that these potential harms exist going forward.

743 F.Supp.2d at 228 (second alteration in original) (emphasis added) (citations omitted) (some internal quotation marks omitted). Even assuming the Court had to apply § 3142, the Court finds that the § 3142(e)(3)'s presumption in favor of detention no longer applies. That is because Dunlap is no longer charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." § 3142(e)(3)(A); *see also* § 3142(f)(2)(B) (allowing the judicial officer to reconsider the detention issue at any time before trial in light of new information).

So contrary to the Government's argument, this Court's Order Dismissing the Indictment for Outrageous Government Conduct is not "legally irrelevant"; rather, it shifts the burden of proof on the detention issue to the Government to prove by a preponderance of the evidence that Dunlap poses a flight risk and by clear and convincing evidence that Dunlap poses a threat to the community. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991); § 3142(f). In light of this case's new procedural posture, the Government may not simply rest on the Magistrate Judge's previous findings to sustain its burden of proof.

But even if the Government could theoretically sustain its burden, the fact remains that there is no operative charging document against Dunlap. This Court cannot and will not simply detain Dunlap because the Government disagrees with the Court's Order. Such a result would be a flagrant disregard to the Fourth and Fifth Amendments. While future events may inject Dunlap back into the prosecutorial machine, he is not currently subject to detention.

The Court finds that since it dismissed the indictment against Dunlap, it lacks the ability to order Dunlap's continued detention under § 3142, notwithstanding § 3143(c). The Court also finds that even if the Court were to evaluate § 3142's detention factors, the presumption in favor of detention no longer arises as a result of charges Dunlap previously faced, since the Court has dismissed the operative charging document against him. The Court accordingly **DENIES** the Government's Motion for Reconsideration in its entirety. The Court's previous Order releasing Dunlap from custody remains in full force and effect.

**IT IS SO ORDERED.**

