PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-1489

———

UNITED STATES OF AMERICA

v.

JAMES R. SED,
Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cr-00054)
District Judge: Honorable David Stewart Cercone

———

Argued November 30, 2009
Before: FISHER, HARDIMAN and
STAPLETON, *Circuit Judges*.

(Filed: April 6, 2010)

Robert L. Eberhardt [Argued]
Laura S. Irwin
Troy Rivetti

Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219-0000
    *Attorneys for Appellee*

William C. Kaczynski [Argued]
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219-0000
    *Attorney for Appellant*

———

OPINION OF THE COURT

———

HARDIMAN, *Circuit Judge*.

James Sed appeals his judgment of conviction, claiming the Pennsylvania State Police violated his Fourth Amendment rights when they arrested him in Ohio. Sed also claims the District Court erred when it failed to reduce his sentence because of "sentencing entrapment" or "sentencing factor manipulation."

**I.**

In 2006 Sed became the subject of a Pennsylvania State Police investigation into cocaine trafficking by Mark Grannison. Believing that Grannison supplied crack cocaine to Sed, the State Police twice arranged for an informant named Tyrone Offie to solicit Sed to sell drugs to State Trooper Michael Poulos, who was acting undercover.

The first controlled purchase occurred on April 21, 2006. On that date, Sed was traveling by car with his girlfriend, Stacie Hickman, when they met up with Poulos and Offie, who were traveling in an unmarked police van. During this initial meeting, Poulos "fronted" Sed $2400 to purchase two ounces of cocaine and Sed in turn placed a call to his supplier (Grannison). Soon after Grannison returned Sed's phone call, the two vehicles proceeded to the parking lot of Alisa's Café in Sharon, Pennsylvania, very near the Ohio border. Although there had been discussion about the deal occurring in Trumbull County, Ohio, Poulos explained to Offie that the recording device they were using in the investigation was authorized for use only in Pennsylvania. In response to Poulos's demand that they remain in Pennsylvania, Offie told Sed that he refused to enter Ohio because he was facing criminal charges there. Consequently, Poulos and Offie waited in the parking lot of Alisa's Café while Sed took the $2400 Poulos had given him and rode with Hickman into Ohio to meet Grannison. Meanwhile, Pennsylvania State Troopers monitoring the situation observed Sed and Hickman meet with Grannison at the South Side Market in Ohio before returning to Pennsylvania to deliver almost 47.1 grams of crack cocaine to Poulos.

3

Six days later, intending to do a "buy bust," Poulos asked Sed to meet him at the Shenango Valley Mall in Hermitage, Pennsylvania so he could buy a larger quantity of crack cocaine. Unwilling to "front" the $5250 necessary to make the purchase, Poulos told Sed he wanted to meet Sed's supplier (Grannison) at the mall. Sometime after that conversation, Sed called Poulos and changed the location of the deal to a gas station at the Hermitage Plaza, a few miles from the Shenango Valley Mall. In anticipation of the deal, Poulos had assembled a "take-down" team composed of Pennsylvania State Police and local police from Sharon, Pennsylvania who stationed themselves near the gas station to make the arrest. That plan was foiled, however, when Sed insisted that the deal transpire in the same manner as the first deal. In light of this change in plans, the take-down team proceeded to the state line. Some officers established surveillance at the South Side Market in Ohio where Sed had met Grannison on April 21, while others watched the parking lot at Alisa's Café where Sed had delivered the crack cocaine to Poulos.

After they left the gas station at the Hermitage Plaza, Poulos and Offie followed Sed and Hickman to Alisa's Café. When they arrived there, Sed exited his vehicle, went to Poulos's van, obtained $5230 for the deal[1], and said he would be right back. Sed and Hickman then drove to the South Side Market in Ohio to meet Grannison. Before Sed returned with the crack cocaine, Poulos saw Grannison drive a green Buick

---

[1] Poulos had given Sed $20 for gas money soon after Sed arrived at the gas station.

LeSabre into the parking lot of Alisa's Café to have a look at Poulos before returning to the South Side Market. Upon Grannison's return, Sed entered the green Buick LeSabre, and the two left the South Side Market. When the police believed Grannison and Sed had re-entered Pennsylvania, they stopped Grannison's car and seized 124 grams of crack cocaine. Sed was arrested and taken to the Sharon Police Department. It was later determined that Grannison's car was stopped in Ohio, less than one hundred yards from the Pennsylvania border.

## II.

Some ten months after the two controlled purchases, a four-count indictment was filed against Sed, Hickman, and Grannison. Sed was charged with: (1) conspiracy to distribute and possess with the intent to distribute fifty (50) grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846 (Count 1); (2) distribution or possession with the intent to distribute five (5) grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii), and 18 U.S.C. § 2 (Count 2); and (3) possession with the intent to distribute fifty (50) grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), 846, and 18 U.S.C. § 2 (Count 3).

Before trial, Sed filed a motion to suppress evidence, claiming the arrest violated his Fourth Amendment right to be free from unreasonable searches and seizures. The District Court denied Sed's motion, and the case proceeded to trial by jury. Sed presented an entrapment defense, testifying that he had a history as a drug user and was not predisposed to sell

5

drugs, but began selling crack cocaine only after an extended campaign of harassment by Offie. The jury was unpersuaded and convicted Sed on all three counts.

Following Sed's conviction, the Probation Office prepared a Presentence Investigation Report (PSR) which noted the statutory range for Sed's crimes of conviction was 120 months to life imprisonment. 28 U.S.C. § 841(b)(1)(A); 21 U.S.C. § 846. The PSR also calculated Sed's base offense level at 32 pursuant to § 2D1.1 of the United States Sentencing Guidelines (USSG). The PSR recommended a two-level enhancement for obstruction of justice under USSG § 3C1.1, to which Sed objected.

Consistent with the PSR, the District Court concluded that Sed "willfully gave false testimony . . . in support of his entrapment defense." In the District Court's view, the "entire line of testimony" about Offie's harassment "clearly was fabricated by defendant to support his defense" because Sed "doggedly pursued the opportunities to complete the large crack cocaine transactions . . . ." Based on this conclusion, the District Court imposed a two-level enhancement for obstruction of justice, which raised Sed's offense level to 34. Sed's criminal history category was I, which yielded an advisory Guidelines range of 151 to 188 months imprisonment. Based on Sed's lack of history in the drug trade and his relatively minor role in Grannison's distribution network, the District Court varied downward and imposed a 130-month term of incarceration.

6

Sed filed this timely appeal. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

**III.**

**A.**

Sed first challenges his conviction, claiming the Pennsylvania State Police violated his Fourth Amendment rights when they seized him in Ohio, beyond their jurisdiction. We review the District Court's findings of fact for clear error. *United States v. Grier*, 585 F.3d 138, 141 (3d Cir. 2009). We exercise plenary review of the District Court's application of the law to the facts. *United States v. Price*, 558 F.3d 270, 276 (3d Cir. 2009) (citations omitted).

Relying principally upon two sections of the Uniform Fresh Pursuit Act, as enacted at Ohio Rev. Code §§ 2935.30 and 2935.31, Sed asserts that his arrest in Ohio by Pennsylvania police violated Ohio law. Consequently, he argues that evidence against him must be suppressed because "the concept of reasonableness embodied in the Fourth Amendment logically and necessarily presumes an exercise of lawful authority by a police officer. The Pennsylvania officers' flagrant indifference to their jurisdictional limitations and Ohio's jurisdictional prerogatives requires suppression." This argument is contrary to the Supreme Court's decision in *Virginia v. Moore*, 128 S.Ct. 1598 (2008), which Sed neglects to address in his initial brief or in his reply brief, despite the Government's heavy reliance upon the case.

In *Moore*, police arrested Moore for driving on a suspended license, even though Virginia law empowered them to issue only a summons for that offense. *Id.* at 1601-02. The question presented to the Supreme Court was "whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law." *Id.* at 1601. Like Sed, Moore argued that his arrest in violation of Virginia law constituted an *ipso facto* violation of the Fourth Amendment. The Supreme Court disagreed, noting: "A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional." *Id.* at 1606. The Court concluded that "while States are free to regulate . . . arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 1607. In light of *Moore*, Sed is plainly wrong when he argues that his arrest in violation of Ohio law renders the conduct of the State Police unreasonable *per se* under the Fourth Amendment.

Our rejection of Sed's categorical argument is not the end of the inquiry, however, because we still must determine whether the seizure was unreasonable under the Fourth Amendment. We review the reasonableness of a seizure under the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Our review of the undisputed facts of this case leads us to conclude that there was nothing unreasonable about the Pennsylvania State Police's seizure of Sed and Grannison, despite the fact that the arrest occurred in Ohio instead of Pennsylvania.

8

Although Sed was seized outside the territorial jurisdiction of the Pennsylvania State Police, the first controlled purchase between Sed and Poulos was negotiated and consummated entirely within Pennsylvania. As for the second controlled purchase, Poulos requested Grannison's presence at the Shenango Valley Mall. When Sed changed the location to the gas station at the Hermitage Plaza, the "take down" team assembled nearby and planned to make the arrest there. The record demonstrates that all state actors believed the second controlled purchase would occur entirely within Pennsylvania until Sed insisted that the deal would have to occur in the same fashion as the first deal six days earlier. Thus, it was only as a result of this last-minute change of plans by Sed that the second controlled buy occurred so close to the state line. Even then, the police intended to arrest Sed in Pennsylvania and believed that they had done so when they stopped Grannison's car.

In sum, Sed had committed a serious drug crime in Pennsylvania and was acting in furtherance of a conspiracy to distribute crack cocaine in Pennsylvania at the time he was seized. The stop of Grannison's car before it entered Pennsylvania was nothing more than an honest mistake and a *de minimis* one at that, considering the game of hopscotch Grannison and Sed played across the Pennsylvania-Ohio border. This mistake does not render the seizure of Sed unreasonable. *Cf. United States v. Delfin-Colina*, 464 F.3d 392, 398-99 (3d Cir. 2006) (stating that a reasonable mistake of fact is "rarely fatal" to the legality of a *Terry* stop even where the mistake goes to the question of whether a crime is being committed). Under these circumstances, the seizure of Sed was not unreasonable

9

and the District Court did not err in denying his motion to suppress evidence.[2]

**B.**

Sed also challenges his sentence, claiming the police entrapped him into selling drugs in amounts beyond what he what he was predisposed to sell (sentencing entrapment) and that they unfairly strung out their investigation solely to increase the quantity of drugs he sold (sentencing factor manipulation). Absent the entrapment or manipulation, Sed contends his Guidelines range would have been much lower because the quantity of drugs he sold would have been substantially smaller.

In reviewing the District Court's sentence for reasonableness, *United States v. Tomko*, 562 F.3d 558, 564 (3d Cir. 2009) (en banc), we examine its factual findings for clear error, and its legal conclusions *de novo*. *Id.* at 567-68. The District Court's finding of fact that Sed perjured himself is entitled to great deference because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what

_____

[2] Our conclusion is supported by the fact that Sed "concede[d] that probable cause existed for his arrest" before the District Court. As the Supreme Court noted in *Whren v. United States*, the balancing of Fourth Amendment factors is rarely in doubt when a search or seizure is based on probable cause. 517 U.S. 806, 817 (1996). The facts surrounding Sed's seizure do not remotely present such a rare case.

10

is said." *United States v. Beckett*, 208 F.3d 140, 148 (3d Cir. 2000) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

We have neither adopted nor rejected the doctrines of sentencing entrapment and sentencing factor manipulation. *See United States v. Tykarsky*, 446 F.3d 458, 476 n.13 (3d Cir. 2006); *United States v. Raven*, 39 F.3d 428, 438 (3d Cir. 1994). Almost all of our sister courts of appeals have opined about both doctrines, reaching varied conclusions. For example, the Courts of Appeals for the First, Eighth, Ninth and Tenth Circuits have adopted sentencing entrapment and sentencing factor manipulation, but they have disagreed as to whether they are separate defenses. *See United States v. Jaca-Nazario*, 521 F.3d 50, 57 (1st Cir. 2008) (both are identical, valid defenses); *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009) (accepting sentencing factor manipulation); *United States v. Martin*, 583 F.3d 1068, 1073 (8th Cir. 2009) (accepting sentencing entrapment, as distinct from manipulation); *United States v. Riewe*, 165 F.3d 727, 729 (9th Cir. 1999) (treating both defenses as identical and valid); *United States v. Beltran*, 571 F.3d 1013, 1017-18 (10th Cir. 2009) (accepting both as identical). On the other hand, the Courts of Appeals for the Fourth, Fifth, Sixth, and District of Columbia Circuits have rejected both doctrines. *See United States v. Jones*, 18 F.3d 1145, 1153-54 (4th Cir. 1994); *United States v. Tremelling*, 43 F.3d 148, 151 (5th Cir. 1995) (rejecting sentencing factor manipulation); *United States v. Snow*, 309 F.3d 294, 295 (5th Cir. 2002) (rejecting sentencing entrapment); *United States v. Guest*, 564 F.3d 777, 781 (6th Cir. 2009); *United States v. Hinds*, 329 F.3d 184, 188 (D.C. Cir. 2003). Finally, the Courts of Appeals for the Seventh and

11

Eleventh Circuits have reached mixed results. *See United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009) (sentencing entrapment valid but sentencing manipulation not); *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007) (sentencing factor manipulation valid but sentencing entrapment not).

Once again, we need not rule on the legal merits of either doctrine because Sed cannot establish the requisite factual predicates for sentencing entrapment or sentencing factor manipulation. As we shall explain, Sed's sentencing entrapment argument fails because the District Court found that Sed perjured himself when he testified regarding his lack of predisposition to sell cocaine. Similarly, Sed cannot show sentencing factor manipulation because the police were not required to arrest Sed after the first controlled purchase.

Sentencing entrapment, under its most expansive formulation, "occurs when official conduct leads an individual otherwise indisposed to dealing in a larger quantity or different type of controlled substance to do so, and the result is a higher sentence." *Martin*, 583 F. 3d at 1073. Here, the District Court's finding of fact that Sed perjured himself with respect to his predisposition to sell drugs is well supported by the record and applies with equal force to Sed's contention that he was predisposed to sell only small quantities of drugs.

The most glaring example of Sed's lack of credibility was his account of his relationship with Offie. Sed testified that Offie had worked for him previously, but that the two became estranged some years before the events in question here. Sed

12

also testified that after Offie was arrested on drug charges and became a government informant, Offie sought Sed out, apologized for his past conduct, and embarked upon an abusive campaign to convince Sed to sell drugs to Poulos. Sed repeatedly claimed that this rapprochement occurred in 2006 at Sed's place of employment, Lone Star Mortgage. But when the prosecutor confronted Sed with the fact that he had stopped working at Lone Star in 2003, Sed changed his story to say that the reconciliation occurred at Lone Star in 2003, or at some point "after [Offie] was arrested in Ohio and Pennsylvania." When the government pointed out that Offie was not arrested until 2005, Sed simply claimed to have been "in a very cloudy state in my—my mind." In addition, the wiretap recordings of many of his negotiations with Offie and Poulos also contradicted Sed's portrait of himself as a reluctant, first-time drug dealer. In these negotiations, Sed raised the possibility of future drug transactions with Poulos, stated that he had previously engaged in drug sales involving up to $20,000, made representations as to the quality of the crack he would sell Poulos, and at one point suggested a much larger sale, which Poulos himself declined as too ambitious. Sed wrote these comments off as mere "puffery," but the District Court was not required to believe that explanation.

As for sentencing factor manipulation, its broadest formulation holds that it is "a violation of the Due Process Clause," *Torres*, 563 F.3d at 734, that "occurs when the government unfairly exaggerates the defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible." *Id*.

13

Here, Sed complains that the police had sufficient evidence to arrest him, Grannison, and Hickman after the first controlled purchase. According to Sed, the decision of the Pennsylvania State Police to arrange for a second, larger deal instead of arresting Sed right away was sufficiently outrageous to violate the Due Process Clause. We have stated previously that it is not a violation of due process for the police to "intentionally delay[] [a] sting operation" in an effort to subject a suspect to a greater penalty. *Tykarsky*, 446 F.3d at 476 n.13. Likewise, other courts of appeals have held that it does not offend due process for the police to "persist in ascertaining what quantity [of drugs a defendant is] willing and able to deal," *United States v. Shephard*, 4 F.3d 647, 649 (8th Cir. 1993), and "that the ultimate seizure of a larger quantity of illegal drugs from a suspect in connection with the arrest has positive societal consequences; eradicating illegal drugs from society is a legitimate, if not the primary, goal of drug enforcement officials," *United States v. Lacey*, 86 F.3d 956, 965 (10th Cir. 1996). We agree with these precedents, and hold that Sed's due process rights were not violated when the Pennsylvania State Police arranged the second controlled purchase in an effort to reveal the extent to which Sed, Grannison, and Hickman were willing to traffic in crack cocaine. For this reason, Sed cannot establish a defense of sentencing factor manipulation, even if we were to adopt the doctrine.

In sum, the record amply supports the District Court's conclusion that Sed perjured himself regarding his supposed lack of predisposition to sell crack cocaine and the Pennsylvania State Police did not act improperly in conducting their sting operation. Absent these essential factual predicates for Sed's

14

claims of sentencing entrapment or sentencing factor manipulation, it follows that the District Court did not err when it failed to grant him a downward departure or an additional downward variance on these grounds.

## IV.

Having found no error by the District Court, we will affirm Sed's judgment of conviction and sentence.

15