NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-3345

_____

UNITED STATES OF AMERICA

v.

ROBERT LAMAR WHITFIELD
a/k/a LAMAR WHITFIELD
a/k/a GOAT,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-12-cr-00418-001
District Judge: The Honorable Juan R. Sanchez

_____

Argued February 29, 2016

Before: McKEE, *Chief Judge*, SMITH, and HARDIMAN, *Circuit Judges*

(Opinion Filed:  May 5, 2016)

Eric B. Henson          **[ARGUED]**
Robert Zauzmer
Virginia P. Pratter
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA  19106
    *Counsel for Appellee*

J. Michael Farrell      **[ARGUED]**
Suite 402N
718 Arch Street
Philadelphia, PA  19106
    *Counsel for Appellant*

————————————

OPINION*

————————————

SMITH, *Circuit Judge.*

This appeal stems from a stash-house robbery sting operation that took place in Philadelphia from June to July of 2012.  Of the eight individuals caught in the operation, three pled guilty prior to trial.[1]  Following their convictions in a joint trial, the remaining five,[2] including Appellant Robert Lamar Whitfield, filed separate appeals, each contesting various issues relating to their convictions (and, for some, their sentences).  For the reasons explained below, we will uphold Whitfield's convictions and corresponding sentence.

---

* This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] These were Najee Murray, Lafayette Rawls, and Jamie Dales.

[2] Whitfield's co-defendants at trial were Marlon Graham, Kareem Long, Kenneth Parnell, and Frank Thompson.  Separate opinions resolving each co-defendant's appeal will be filed.  *See United States v. Graham*, No. 14-3717; *United States v.*

## I.

In June of 2012, a confidential informant (CI) contacted Whitfield and asked for help getting in touch with a mutual acquaintance so that the CI could invite the acquaintance to rob a drug stash house. Whitfield instead volunteered to take care of the robbery himself, claiming that he had significant experience robbing stash houses in the past. The CI then put Whitfield in touch with the CI's "uncle," who turned out to be an undercover agent for the Bureau of Alcohol, Tobacco, and Firearms (ATF). Whitfield met with the agent on several occasions to discuss the robbery. Whitfield recruited others to join in the scheme, and these in turn recruited still more.

Plans came to a head on July 18, 2012, when Whitfield and seven others met with the undercover agent in the parking lot of a Hilton Hotel where the agent once again told those present about the robbery, including that he expected ten kilograms of cocaine to be inside the stash house, and that he expected the house to be guarded by two men, one with a pistol and the other within reach of an assault-style rifle. The agent then made clear that any who wished to withdraw should do so at that time. After no one expressed hesitation about the plan, the group proceeded to a junkyard, presumably to check out a van that the agent was to have

*Long*, No. 14-3703; *United States v. Parnell*, No. 14-4100; *United States v. Thompson*, No. 14-4512.

rented for use during the robbery. There, the group continued making preparations for the robbery, with several individuals arranging and inspecting firearms and Whitfield distributing gloves to all present. At the undercover agent's signal, law enforcement officials then swarmed the yard and arrested the group.

A grand jury returned an indictment charging each of the co-conspirators with multiple inchoate Hobbs Act robbery and drug distribution offenses, as well as with the crime of carrying a firearm during and in relation to a crime of violence or a drug trafficking crime.[3] The jury convicted Whitfield and his co-defendants on all counts for which they were mutually charged. Whitfield was subsequently sentenced to 188 months in prison. He then timely filed this appeal.[4]

## II.

Whitfield raises a number of issues for our consideration on appeal. First, he argues that the government failed to prove that the plan to rob a fictitious stash house "obstruct[ed], delay[ed], or affect[ed] commerce," as is required for a Hobbs Act robbery conviction, *see* 18 U.S.C. § 1951(a); second, he asserts that the District Court should have granted his and his co-defendants' request for discovery

---

[3] The indictment also charged Long, Thompson, and Dales with being felons in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Long and Thompson were acquitted at trial on this count.

to support a possible selective enforcement claim; third, he claims that the indictment should have been dismissed due to "outrageous government conduct"; fourth, he argues that the District Court violated his Confrontation Clause rights by prohibiting him from cross-examining a cooperating witness about his mental health issues; and fifth, he claims that he was the victim of sentencing entrapment and/or sentencing factor manipulation, thereby resulting in an enhanced sentence. We will address each argument in turn below.

## A.

Whitfield argues that the planned stash-house robbery could not possibly have "affect[ed] commerce" because the stash house and the cocaine were purely fictitious. Accordingly, he claims that the District Court erred by denying a motion to dismiss the Hobbs Act counts in the indictment,[5] as well as motions for acquittal

---

[4] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[5] Section 1951(a) of the Criminal Code provides, in relevant part, as follows:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The effect-on-commerce requirement is a "jurisdictional element," *United States v. Clausen*, 328 F.3d 708, 710 (3d Cir. 2003), the absence of which prevents prosecution under the Hobbs Act.

and/or a new trial.

This Court has already squarely rejected this argument. In *United States v. Jannotti*, we considered whether federal jurisdiction existed over Hobbs Act conspiracy and attempt charges arising from a sting operation featuring similarly fictitious elements. 673 F.2d 578, 581 (1982) (en banc). We concluded that it was "irrelevant that the ends of the conspiracy were from the very inception of the agreement objectively unattainable." *Id.* at 591. Because "the defendants agreed to do acts which, had they been attainable, would have affected commerce,"[6] it did not matter whether their agreement or attempt had "an actual effect on commerce." *Id.* at 592.[7]

Accordingly, we will affirm the District Court's orders denying Whitfield's

---

[6] At the trial of Whitfield and his co-defendants, the government's expert witness testified that it is impossible to produce cocaine in Pennsylvania (or anywhere else in the United States), and that ten kilograms of cocaine have a street value of at least $360,000. Thus, the government presented ample evidence that, had the object of the conspiracy been accomplished, the robbery would have satisfied the Hobbs Act's jurisdictional element. *See United States v. Walker*, 657 F.3d 160, 181 (3d Cir. 2011).

[7] Whitfield and his co-defendants argue that *Jannotti* was impliedly overturned by our decision in *United States v. Manzo*, 636 F.3d 56 (3d Cir. 2011). This is clearly incorrect. Not only does Third Circuit procedure prohibit a panel of this Circuit from overturning an earlier precedent of a different panel, *see* Third Circuit I.O.P. 9.1, *Manzo* explicitly endorsed *Jannotti*'s continuing vitality. *See Manzo*, 636 F.3d at 68 (stating that "*Jannotti* represents the proper circumstances that support a charge for conspiracy to commit a Hobbs Act violation," and distinguishing the facts in the case at bar from *Jannotti*).

motions that were premised on our lack of jurisdiction under the Hobbs Act.

**B.**

Whitfield next argues that the District Court erred in denying defendants' post-trial motion for discovery to support a claim of selective enforcement.[8] To support the motion for discovery, defendants cited statistics to the effect that every one of the approximately twenty people charged in stash-house robbery sting cases in the Eastern District of Pennsylvania since 2009 was African American. The District Court denied the motion because (i) defendants forfeited their selective enforcement claim by failing to raise it before trial, and (ii) even absent forfeiture, they failed to present sufficient evidence to satisfy the standard enunciated in *United States v. Armstrong*, 517 U.S. 456 (1996), and thus did not qualify for discovery into possible selective enforcement.

We agree with the District Court that Whitfield and his co-defendants forfeited their selective enforcement claim. Claims or defenses based on a "defect in instituting the prosecution" must be raised before trial. Fed. R. Crim. P.

---

[8] Though Whitfield and his co-defendants sometimes use the phrase "selective prosecution," it is clear that their allegations of possible racial discrimination are directed toward law enforcement and their decisions about which individuals to target for stash-house stings rather than toward prosecutors and their decisions about which stash-house sting targets to ultimately prosecute. Thus, we will refer to their claim as one sounding in "selective enforcement."

12(b)(3)(A)[9]; *United States v. Salahuddin*, 765 F.3d 329, 350 (3d Cir. 2014) (treating as forfeited selective prosecution claim not raised before trial). Nevertheless, Whitfield and his co-defendants did not file their motion seeking discovery to support their selective enforcement claim until months after trial. They also failed to show "good cause" for the delay, Fed. R. Crim. P. 12(e),[10] as they pointed to no material evidence to support their claim that was not available before trial. *See Salahuddin*, 765 F.3d at 350. We will thus affirm the District Court's order denying defendants' motion for discovery.[11]

---

[9] Rule 12 was amended after the District Court denied defendants' motion for discovery to pursue a claim of selective enforcement. *See* Fed. R. Crim. P. 12 advisory committee notes to 2014 Amendments. None of these changes impact the District Court's decision to deny the motion, nor our analysis of that decision.

[10] The "good cause" provision of Rule 12 has since been relocated to subdivision (c)(3).

[11] While we need not reach the issue, we also think the District Court did not abuse its discretion in applying the *Armstrong* standard to deny defendants' discovery request. Although *Armstrong* dealt only with a discovery request into possible selective *prosecution*, and although it appears that the Third Circuit has not reached the precise question of whether the *Armstrong* standard for discovery applies equally to claims of selective *enforcement*, the prima facie elements for both selective prosecution and selective enforcement are the same: discriminatory effect and discriminatory intent. *Compare Armstrong*, 517 U.S. at 465 (elements for selective prosecution claim) *with Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (elements for selective enforcement claim). Thus, it is unsurprising that other courts have used the *Armstrong* discovery standard in analyzing discovery requests related to selective enforcement. *See United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) ("[A] defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection

8

## C.

Whitfield also claims that the District Court erred by denying his post-trial motion to dismiss the indictment due to outrageous government conduct. We need not discuss the merits of this argument, however, because, like the motion for discovery to pursue a claim of selective enforcement, Whitfield forfeited this issue

standards' that *Armstrong* outlines for selective prosecution claims."); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).

The above said, we acknowledge that the *Armstrong* standard poses a hurdle that is, in most cases, effectively insurmountable. *See United States v. Thorpe*, 471 F.3d 652, 663 (6th Cir. 2006) (collecting cases and commentary discussing difficulty of satisfying *Armstrong* burden); Richard H. McAdams, *Race and Selective Prosecution: Discovering the Pitfalls of* Armstrong, 73 Chicago-Kent L. Rev. 605, 618-23 (1998) (arguing that the *Armstrong* standard for discovery raises an effectively "insuperable" barrier to even meritorious selective prosecution claims because the only evidence regarding the non-prosecution of similarly-situated persons of a different race is typically within the prosecutor's sole possession and control). This seems especially true in reverse-sting cases like this one: even assuming defendants were targeted because of their race, it defies reality to think that they could ever make "a credible showing" that "similarly situated persons" of other races "could have been [targeted] for the offenses for which the [defendants] were [targeted], but were not so [targeted]." *Armstrong*, 517 U.S. at 470. Perhaps this concern is what motivated the Seventh Circuit's recent decision in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc), a stash-house robbery sting case much like this one in which the court held that *Armstrong* did not apply to the defendants' discovery requests related to a possible selective enforcement claim. *See id.* at 722 ("[S]ome of the discovery asks for information from supervisors or case agents of the FBI and ATF, and this is outside the scope of *Armstrong*.").

Whether or not the court in *Davis* was correct that *Armstrong* should not apply to selective enforcement claims is a question for another day. We simply note our concern regarding law enforcement tactics like those in this case, and add our

9

by failing to raise it before trial.[12]  *See United States v. Pitt*, 193 F.3d 751, 760 (3d

Cir. 1999) (holding that the defense of outrageous government conduct "is covered

by the provisions of Fed. R. Crim. P. 12(b)," and therefore must be raised pretrial).

**D.**

Whitfield next claims that the District Court violated his rights under the

Confrontation Clause of the Sixth Amendment by preventing him from cross-

examining a government witness regarding the witness' mental health issues.  We

review for abuse of discretion any limitation that a district court places on the

scope of cross-examination.  *United States v. Mussare*, 405 F.3d 161, 169 (3d Cir.

2005).  We will reverse only when the limitation "is so severe as to constitute a

---

voice to others who have expressed doubts about the seemingly impossible burden
facing those attempting to challenge these tactics as racially discriminatory.

[12] In an attempt to show "good cause" for the untimely motion, Whitfield points to
*United States v. Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014), in which the district
court for the Central District of California concluded that the government's
conduct in a stash-house sting operation similar to the operation underlying this
case violated the defendant's due process rights.  *See id.* at 788.  Whitfield's
attempt fails for two reasons.  First, *Hudson* does not provide any previously
unavailable evidence to support his claim of outrageous government conduct. *See
Pitt*, 193 F.3d at 761 (noting that outrageous government conduct defense forfeited
because defendant "was always aware of the facts upon which he now claims this
defense").  Second, the Ninth Circuit subsequently overturned *Hudson*, thereby
undercutting any persuasive force it once had.  *United States v. Dunlap*, 593 F.
App'x 619, 621 (9th Cir. 2014) (concluding that the government's conduct "did
not violate fundamental fairness or shock the universal sense of justice mandated
by the Due Process Clause of the Fifth Amendment" (internal quotation marks and
citation omitted)).

denial of the defendant's right to confront witnesses against him and . . . is prejudicial to [his] substantial rights." *United States v. Conley*, 92 F.3d 157, 169 (3d Cir. 1996).

At trial, the government called Najee Murray to testify about, among other subjects, several robberies that Whitfield had committed prior to the stash-house robbery opportunity in this case, including a robbery that Whitfield and Murray committed in concert. Prior to trial, the government disclosed to defense counsel that Murray had been receiving treatment for depression. During his cross-examination of Murray, Whitfield attempted to question Murray about his mental health problems, including any diagnoses other than depression. After the government objected, however, the District Court instructed Whitfield, in no uncertain terms, that he was not allowed to ask Murray about any other mental health diagnoses or the symptoms of any mental ailments that might have affected Murray's ability to accurately perceive and/or recall the events to which he was testifying. Instead, Whitfield was permitted to ask Murray only about the effects, if any, that his depression medication had on his perception or memory.

Preventing Whitfield from cross-examining Murray about how the symptoms of his depression or other potential mental impairments affected his perception or memory indeed constituted a significant limitation. Nevertheless, we do not think the District Court abused its discretion in imposing this limitation, nor

11

do we think it was "so severe as to constitute a denial of [Whitfield's] right to confront [Murray]." *Conley*, 92 F.3d at 169. Other than his attorney's observation that Murray "look[ed] . . . sedated" while on the stand, Whitfield never attempted to present evidence to the District Court outside the presence of the jury suggesting that Murray suffered from any mental infirmities other than depression, or that his depression impacted his credibility in any way.[13] Furthermore, the limitation did not represent a *total* ban on questions relating to Murray's mental health, as Whitfield was allowed to elicit testimony confirming that Murray indeed was undergoing treatment for depression during the period in question, and to cross-examine Murray about the effect of his depression medication on his memory and perception. *Cf. United States v. Robinson*, 583 F.3d 1265, 1274-75 (10th Cir.

---

[13] This is not to say that depression can never affect a witness' credibility. Indeed, some courts have recognized that, at least in some severe cases of depression, it can have such an effect. *See, e.g., United States v. Smith*, 77 F.3d 511, 516-17 & n.3 (D.C. Cir. 1996) (citing medical literature regarding "Major Depressive Disorder" to reject assertion that "a patient suffering from depression would not necessarily be subject to symptoms that might cast doubt on his testimony as a witness"). But where a defendant fails, as Whitfield did below, to point to *any* indication that a witness' particular case of depression was so severe that it may have impaired his memory or perception, we think it is well-within the sound discretion of the district court to restrict cross-examination related to the witness' depression. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, . . . or interrogation that is . . . only marginally relevant.").

12

2009) (concluding that, "viewed against the backdrop of the [witness'] centrality to the government's case," district court's "categorical" prohibition against cross-examination regarding witness' mental health and use of prescription medications violated Confrontation Clause). Thus, we will uphold the District Court's restriction on Whitfield's cross-examination of Murray as a valid exercise of the court's discretion.

**E.**

Finally, Whitfield argues that ATF engaged in sentencing factor manipulation[14] by selecting ten kilograms as the quantity of cocaine to be obtained, thereby triggering the ten-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A) and resulting in a higher range under the Sentencing Guidelines. We review criminal sentences for reasonableness. *United States v. Sed*, 601 F.3d 224, 229 (3d Cir. 2010). We examine for clear error a district court's factual

---

[14] In his appellate brief, Whitfield uses the phrases "sentencing manipulation" and "sentencing entrapment" essentially interchangeably. To the extent he refers to sentencing entrapment as short-hand to argue that he was "indisposed" to committing the offenses presented to him by ATF in this case, *United States v. Sed*, 601 F.3d 224, 230 (3d Cir. 2010); *United States v. Briggs*, 623 F.3d 724, 729 (9th Cir. 2010), we hold that Whitfield has forfeited this argument by failing to adequately raise it on appeal. Simply put, despite his repeated invocation of the phrase "sentencing entrapment," he never points to facts related to, or even mentions, his criminal predisposition (or lack thereof). Mere passing reference to an issue without argument or supporting citations waives the issue before this Court. *United States v. Stock*, 728 F.3d 287, 290 n.3 (3d Cir. 2013).

findings in support of the sentence imposed, and its legal conclusions *de novo*. *Id*. Whitfield had the burden of proving sentencing factor manipulation. *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009).

As Whitfield acknowledges, this Circuit has "neither adopted nor rejected the doctrines of sentencing entrapment and sentencing factor manipulation." *Sed*, 601 F.3d at 229. In contrast to the defense of sentencing entrapment, which "focuses on the defendant's predisposition," "sentencing factor manipulation focuses on the government's conduct." *United States v. Sanchez*, 138 F.3d 1410, 1414 (11th Cir. 1998). According to "its broadest formulation . . . it is 'a violation of the Due Process Clause,' that 'occurs when the government unfairly exaggerates the defendant's sentencing range . . . .'" *Sed*, 601 F.3d at 231 (quoting *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009)).

We need not decide whether to adopt the doctrine of sentencing factor manipulation at this time, however, because the District Court did not clearly err in finding that ATF had legitimate reasons for depicting the stash house as containing at least ten kilograms of cocaine. Specifically, ATF selected this quantity based on information received from the Drug Enforcement Agency–Philadelphia Division and the Philadelphia Police Department-Narcotics Division to the effect that ten kilograms fairly represented the amount of cocaine one could expect to find in a real stash house in Philadelphia at the time. Thus, it was not the case that ATF

14

chose the quantity solely, or even principally, in order to inflate defendants' sentences. *Cf. United States v. Ciszkowski*, 492 F.3d 1264, 1271 (11th Cir. 2007). We will therefore affirm Whitfield's sentence as reasonable. *Cf. Sanchez*, 138 F.3d at 1414.

## III.

We will affirm the District Court's judgment and sentence as to Whitfield.