NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1196
_____

UNITED STATES OF AMERICA

v.

SEAN MOFFITT,
                                        Appellant


_____


On Appeal from the United States District
Court for the Western District of Pennsylvania
(D.C. Criminal No. 2-12-cr-00147-002)
District Judge: Honorable Cathy Bissoon
_____

Argued: February 8, 2018

Before: CHAGARES, SCIRICA, and COWEN, Circuit Judges

(Opinion Filed: January 9, 2020)

David R. Fine **[ARGUED]**
K&L Gates LLP
Market Square Plaza
17 N. Second St., 18th Fl.
Harrisburg, PA 17101
        *Counsel for Appellant*

Soo C. Song
Laura Schleich Irwin **[ARGUED]**
United States Attorney's Office
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
        *Counsel for Appellee*

————————————

OPINION[*]

————————————

**SCIRICA**, *Circuit Judge*

Sean Moffitt moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. His primary argument is that his lawyer was constitutionally ineffective for failing to raise a sentencing entrapment defense at his jury trial. Because Moffitt cannot demonstrate prejudice under the Supreme Court's *Strickland* doctrine, we will affirm the District Court's denial of his motion.

**I.**

**A.**

This case involves a reverse-sting operation: an undercover law enforcement agent posing as a dissatisfied drug courier proposed robbing a fictional stash house. With the promise of a big payday, the agent enlisted a handful of willing participants, including Sean Moffitt. When Moffitt took steps in furtherance of the crime, he was arrested and prosecuted.

In April 2012, Bruce Stukey, an undercover agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), met Chad Revis (Moffitt's cousin) through a confidential informant. Agent Stukey held himself out as "Jake," a disgruntled courier for a cocaine trafficking organization. In that guise, Agent Stukey complained that his drug

———————————————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

organization had denied him a lucrative selling role, instead relegating him to deliveryman. Agent Stukey told Revis he planned to rob the organization's stash house, which stored twelve to eighteen kilograms of cocaine.

Although Agent Stukey set the robbery scheme in motion, Revis undertook important next steps. On May 2, 2012, Revis introduced Agent Stukey to Sean Moffitt and Edward Harris (Moffitt's uncle), both of whom expressed interest in joining the robbery scheme. Before the meeting, Revis told Agent Stukey that Moffitt and Harris need not know the quantity of drugs they would steal. Agent Stukey disagreed and described the plan to all three men, including the amount of drugs involved. When the meeting ended, the plan was for all four men to participate in the robbery of the fictitious stash house.

But the plan changed. At the meeting, Moffitt and Harris became suspicious that Revis understated the amount of drugs targeted. Moffitt later testified that Agent Stukey told them that the stash house would likely have around ten kilograms of cocaine. Moffitt and Harris decided to cut Revis out of the scheme. Harris then called Agent Stukey and asked for a follow-up meeting, which was to include Moffitt but exclude Revis, and also requested that Revis not be informed about the meeting.

Thus Moffitt and Harris initiated a second meeting. This meeting was secretly recorded on video with sound by Agent Stukey. Moffitt and Harris argued that Agent Stukey should cut out Revis, with Harris stating: "We're the guns. I'm the [expletive] man. [Moffitt] is my right-hand man." Gov't Ex. 8, at 4:00. Moffitt explained that he and Harris were more experienced than Revis at robbing stash houses, stating "that's why

3

[Revis] called us." Gov't Ex. 8, at 6:36. Throughout the conversation, Moffitt was enthusiastic, telling Agent Stukey, "we really want to do this thing." Gov't Ex. 8, at 4:16. Harris stated that Agent Stukey's offer was a "blessing," which Moffitt verbally agreed with. Gov't Ex. 8 at 4:40. Harris stated that he would treat Agent Stukey fairly "so we could do it the [expletive] again," which Moffitt again verbally agreed with. Gov't Ex. 8, at 7:16. Agent Stukey feigned hesitation and twice said that he needed to "process" everything. This led Moffitt and Harris to pressure Agent Stukey to include them in the robbery. Harris touted their robbery experience, explaining "we done pulled off licks; we hit [people] for 20 bricks before." Gov't Ex. 8, at 13:39.[1] He also assured Agent Stukey that they would "walk [him] through" the process. Gov't Ex. 8, at 11:15.

Throughout the recorded conversation, Moffitt and his coconspirators were explicit about their understanding of the amount of cocaine involved in the robbery. Moffitt and Harris expressed their suspicion that Revis had underrepresented the amount of cocaine involved in order to deprive them of the robbery's fruits, with Moffitt saying, "the stuff [Revis] told us was totally different than what you told us." Gov't Ex. 8, at 3:53. Moffitt added that Revis told them they would only be taking "two or three ounces [of cocaine] a piece." Gov't Ex. 8, at 5:50. But he said he knew Revis was lying when he said there were only "nine ounces at most" of cocaine. Gov't Ex. 8, at 12:10. Later in the conversation, Agent Stukey confirmed that there would likely be eight to twelve kilograms of cocaine at the stash house, and Moffitt nodded his head and said, "See!"

---

[1]     One "brick" of cocaine is one kilogram. In Pittsburgh, as of 2012, a kilogram of cocaine had a value of approximately $30,000.

Gov't Ex. 8, at 10:27. In response to Agent Stukey's disclaimer that there could be slightly more or less drugs than that, Harris said, "whatever it is, we will split it three ways," and Moffitt again verbally agreed. Gov't Ex. 8, at 10:45.

During the recorded conversation, Moffitt and Harris explicitly expressed their readiness to use violence to pull off the robbery. In explaining why Agent Stukey needed their help, Harris got to the heart of the matter: "Dealing with that much [cocaine], it ain't like those [people] are gonna be like 'well here you can just have it' [so] we're the ones [you need]." Gov't Ex. 8, at 12:18. Moffitt agreed, saying "it might get ugly." Gov. Ex. 8, at 12:30.

The next day, Moffitt, Harris, and another individual, Tone,[2] met Agent Stukey at a restaurant. At this meeting—also secretly recorded on video with sound—Moffitt asked Agent Stukey for the stash house's location. The stash house moved around, Agent Stukey explained, and his superiors often told him the location at the last minute, giving him a brief window in which to seize the cocaine. Stukey asked whether the men had the firearms needed to accomplish the robbery, and Moffitt assured him they did. Moffitt even said they would come with "weapons of mass destruction." S.A. 131. Harris reiterated his and Moffitt's qualifications for the job: "We do this. This is what we do, and we got good connections." Gov't Ex. 9 at 22:54.

Less than a week later, Agent Stukey called Harris and told him the robbery would take place the next day. Harris called Agent Stukey the following morning to confirm the robbery was still on schedule. Agent Stukey instructed Harris to meet him at the Knight's

---

[2]     Agent Stukey testified that he never had contact with Tone again after this meeting.

Inn in Bridgeville, Pennsylvania. Harris arrived with an accomplice, whom Harris had recruited to help with the scheme. Harris explained to Agent Stukey that his crew was ready and nearby in two different vehicles. Harris then rode with Agent Stukey to pick up a van he believed would be used in the robbery. Agent Stukey asked, and Harris confirmed, that the rest of the robbery "crew" were the people that Agent Stukey had met at the restaurant, *i.e.*, Moffitt and Tone. When they arrived at the supposed robbery van, Harris and another accomplice, who had followed them to the van, were arrested.

Unaware of the arrests and in a series of phone calls, Moffitt pressed Agent Stukey for the stash house location. Agent Stukey in turn asked to meet Moffitt in person. Moffitt declined Agent Stukey's repeated requests, explaining he did not want to ride around with "all of the artillery." S.A. 143. Moffitt later admitted he was in the Bridgeville area that morning, near where the robbery would take place. After additional conversations, Agent Stukey called off the robbery. Moffitt was arrested later.

**B.**

A grand jury indicted Moffitt, Harris, and the accomplice, charging them with two counts of conspiring to possess with intent to distribute and attempting to possess and distribute, five kilograms or more of cocaine. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), 846. The day before trial, Harris pleaded guilty to both counts of the indictment.[3]

---

[3] Harris was sentenced to 200 months' incarceration and five years of supervised release. On July 14, 2015, Harris's sentence was reduced to 150 months, after the United States Sentencing Commission amended U.S.S.G. § 2D1.1 to decrease the base offense level for drug offenses by 2 levels and applied this amendment retroactively.

Moffitt proceeded to trial, employing a trial strategy focusing on his innocence. His trial counsel argued Moffitt was innocent, that he was just "play[ing] along," and had no intent "to be part of any of the actions." S.A. 78. Moffitt testified before the jury that he had never intended to go along with Agent Stukey's scheme, and that he was just feigning interest in the robbery. He did not deny that he attended a subsequent lunch with the co-conspirators, who discussed the logistics for the planned robbery. On cross-examination, Moffitt struggled to answer questions and became frustrated, repeatedly refusing to answer questions. For example, Moffitt testified on direct examination he had previously trafficked in heroin, but only heroin. On cross-examination, after several evasive answers, Moffitt admitted he had also been convicted of trafficking cocaine—the drug at issue in the present case. As another example, Moffitt struggled to explain what he was doing on the day of the robbery. Although he claimed he was at his aunt's house for part of that day, he admitted he did not know her address.

Throughout the trial, Moffitt focused on his innocence and his lawyer stuck to that strategy. Although the District Court ultimately gave a jury instruction on entrapment, Moffitt's lawyer did not argue entrapment before the jury and Moffitt did not testify to anything suggesting he was entrapped. When the district judge asked Moffitt's counsel whether he wanted an entrapment jury instruction, Moffitt's counsel did ask for it. But he acknowledged that he might later request removing it and that it was "not necessary" because Moffitt's "defense [was] focused on a denial that he was ever in a conspiracy."

7

S.A. 388. Moffitt's counsel also told the district judge that "entrapment is something that we haven't pursued . . . with our defense and our theory of defense." S.A. 389.[4]

The jury convicted Moffitt of both counts.

## C.

Because of his career offender status, Moffitt was sentenced to a statutorily mandated term of life imprisonment. Days before trial, the government filed a notice under 21 U.S.C. § 851 (the "851 notice"), establishing that Moffitt had two or more prior convictions for felony drug offenses. This notice triggered 21 U.S.C. § 841(b)(1)(A), which mandates a life sentence for persons convicted of, *inter alia*, an offense under § 841 after two or more prior felony drug convictions.[5] *See id.* At the sentencing hearing on February 5, 2014, the court sentenced Moffitt to life imprisonment.

## D.

On direct appeal, Moffitt challenged only the admission of two prior convictions under Federal Rule of Evidence 404(b), and we affirmed. *See United States v. Moffitt*, 601 F. App'x 152 (3d Cir. 2015). Moffitt then filed a motion under 28 U.S.C. § 2255, alleging ineffective assistance of counsel, which the District Court denied.[6] We granted a

---

[4]    The District Court also instructed the jury to acquit Moffitt if it found "that the government conduct in this case with respect to Sean Moffitt is so outrageous as to be shocking in the universal sense of justice . . . under the due process clause . . . ." S.A. 537.

[5]    Moffitt's counsel obtained a continuance during sentencing as part of an attempt to persuade the government to withdraw the 851 notice. The United States Attorney's Office for the Western District of Pennsylvania declined to revoke the 851 notice.

[6]    The District Court had jurisdiction under 28 U.S.C. § 2255. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). *See United States v. Davenport*, 775 F.3d 605, 608 n.4 (3d Cir. 2015).

8

certificate of appealability limited to two questions: (1) whether "counsel was ineffective for failing to argue, at sentencing, that Moffitt should have been sentenced at a lesser drug quantity because the Government unfairly exaggerated the quantity of cocaine with which he was charged;" and (2) whether "counsel was ineffective for failing to request a jury instruction that would have allowed the jury to find Moffitt guilty at a lesser drug quantity for the same reason."[7]

## II.

In reviewing the District Court's decision to summarily dismiss Moffitt's motion for relief under 28 U.S.C. § 2255, we must consider whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *See United States v. Day*, 969 F.2d 39, 41 (3d Cir. 1992) (articulating the standard of review). But "the question of whether to order a hearing is committed to the sound discretion of the district court . . . . Accordingly, we review this matter to determine if the trial court abused its discretion" in declining to order a hearing.[8] *Id.*

---

[7] After granting a certificate of appealability, we appointed David R. Fine of K&L Gates LLP to serve as Moffitt's counsel. *See* 28 U.S.C. § 1915(e)(1). We express our appreciation to Mr. Fine for accepting this matter pro bono and for capably briefing and arguing this case.

[8] The Sixth Amendment guarantees "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). "Regardless of whether an ineffective assistance of counsel claim is raised in a motion for a new trial, on collateral review, or on direct appeal, the standard of review is the same." *United States v. Washington*, 869 F.3d 193, 203-04 (3d Cir. 2017). "We exercise plenary review over the legal component" of the claim and "review the underlying facts for clear error, but exercise independent judgment on whether those facts, as found by the District Court, show that counsel rendered ineffective assistance." *Davenport*, 775 F.3d at 608 (citation omitted).

Moffitt contends that both his trial counsel and sentencing counsel were constitutionally ineffective for failing to raise a sentencing entrapment defense. In the context of drug distribution crimes, the contention is that the defendant lacked the culpability to traffic in the amount of drugs charged—*i.e.*, more than five kilograms of cocaine in Moffitt's case. A defendant asserting sentencing entrapment "argues that, although predisposed to commit a minor or lesser offense, he has been entrapped into committing a greater offense subject to greater punishment." *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007).

---

Under *Strickland*'s two-part standard, Moffitt must show both that "counsel performed deficiently and that counsel's deficient performance caused him prejudice." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (citing *Strickland*, 466 U.S. at 687). To satisfy *Strickland*'s deficiency prong, Moffitt must show that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 688. "*Strickland*'s first prong sets a high bar." *Buck*, 137 S. Ct. at 775. Defense lawyers "face[] any number of choices about how best to make a client's case." *Id.* Thus, a lawyer's conduct is objectively reasonable "so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 690).

Under *Strickland*'s second prong, Moffitt must show that he was prejudiced by counsel's deficient performance. The prejudice standard is demanding: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Rather, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 594. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* We may resolve an ineffectiveness claim under either prong. *Id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

Moffitt concedes he had previously dealt with "modest volumes of drugs." Appellant Br. at 22. But he contends he would not have been willing to traffic eight to twelve kilograms of cocaine if Agent Stukey had not entrapped him.

Neither the Supreme Court nor the Third Circuit has yet endorsed a sentencing entrapment defense. *See Washington*, 869 F.3d at 210; *United States v. Sed*, 601 F.3d 224, 229-230 (3d Cir. 2010). And courts of appeals have divided on whether to recognize the defense. Five courts of appeals have recognized some form of sentencing entrapment,[9] with some setting demanding standards.[10] But four other courts of appeals have declined to recognize a sentencing entrapment defense.[11]

---

[9] The Eighth and the Ninth Circuits focus on the "defendant's predisposition" to deal in a certain quantity of drugs. *See United States v. Yuman-Hernandez*, 712 F.3d 471, 475 (9th Cir. 2013) (explaining that the focus of the analysis is on predisposition and that a defendant has the burden of showing either a lack of intent *or* a lack of capability to deal in the quantity of drugs charged); *United States v. Martin*, 583 F.3d 1068, 1073 (8th Cir. 2009). The First Circuit, in contrast, "focuses primarily on the behavior and motives of the government." *United States v. Jaca-Nazario*, 521 F.3d 50, 58 (1st Cir. 2008). And the District of Columbia and Seventh Circuits appear to consider both the defendant's predisposition and the government's conduct. *See United States v. Mack*, 841 F.3d 514, 523–24 (D.C. Cir. 2016) ("[S]entencing entrapment occurs if the government induces a defendant to commit a more serious crime when he was predisposed to commit a less serious offense.") (quotation marks and citation omitted); *United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009) ("The defendant must show (1) that he lacked a predisposition to commit the crime, and (2) that his will was overcome by unrelenting government persistence.") (internal quotation marks and citation omitted).

[10] *See, e.g.*, *Turner*, 569 F.3d at 641 (describing a "high bar" and requiring "unrelenting government persistence"); *Jaca-Nazario*, 521 F.3d at 58 (requiring "extraordinary misconduct" by the government) (quoting *United States v. Barbour*, 393 F.3d 82, 86 (1st Cir. 2004)).

[11] *See United States v. Macedo-Flores*, 788 F.3d 181, 187 (5th Cir. 2015) ("This court has never recognized sentencing entrapment as a defense, but we have consistently noted that, were we to accept the defense, it would only be cognizable in cases involving 'true entrapment,' or where there is proof of 'overbearing and outrageous conduct' on the

11

**III.**

As noted, Moffitt contends that both his trial counsel and sentencing counsel were constitutionally ineffective for failing to raise a sentencing entrapment defense. We disagree. There is no reasonable probability that raising a sentencing entrapment defense would have altered the outcome at trial or sentencing. Accordingly, both of Moffitt's ineffective assistance claims fail under *Strickland*'s second prong, and the District Court did not abuse its discretion in declining to hold an evidentiary hearing.

**A.**

Moffitt cannot establish trial counsel's decision to forego a sentencing entrapment defense prejudiced him. Even if a sentencing entrapment argument had been made and a corresponding jury instruction had been sought, the outcome would have been unchanged because the record did not support such a defense. "A defendant is entitled to an instruction on his theory of the case where the record contains evidentiary support for it." *United States v. Weatherly*, 525 F.3d 265, 270 (3d Cir. 2008) (internal quotation marks and citation omitted).

We conclude the record does not support a sentencing entrapment defense. Nothing in the record suggests that Agent Stukey coerced or placed pressure on Moffitt to participate. *Cf. United States v. Mayfield*, 771 F.3d 417, 422, 441 (7th Cir. 2014) (en

Government's part.") (citations omitted); *United States v. Guest*, 564 F.3d 777, 781 (6th Cir. 2009) ("The Sixth Circuit has already addressed sentencing entrapment . . . [and it] does not recognize [the] defense."); *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007) ("While our Circuit does not recognize sentencing entrapment as a viable defense, we do recognize the outrageous government conduct defense, and we have considered sentencing manipulation as a viable defense."); *United States v. Ramos*, 462 F.3d 329, 335 (4th Cir. 2006).

banc) (faulting the government for "pair[ing] the reward of a stash-house robbery with an extended campaign of persuasion that played on Mayfield's financial need and culminated in a veiled threat of reprisal from a vicious street gang"). The opposite was true here. Agent Stukey initially targeted Revis, who then introduced Stukey to Moffitt and Harris. *Cf. id.* at 420-21 (finding sentencing entrapment plausible in case where government agent directly recruited defendant and played on his known financial difficulties). But Moffitt and Harris cut Revis out of the scheme—they pitched their services to Agent Stukey over the course of their meetings during which they bragged about their prior robberies. At one point, Moffitt exclaimed: "We really want to do this thing." Gov't Ex. 8, at 4:16.

Nor was there any evidence that Agent Stukey induced Moffitt to steal a larger quantity of drugs than he was predisposed to steal. Moffitt and Harris bragged about prior criminal activity, including stealing 20 kilograms of cocaine. Revis initially underreported the amount of cocaine involved, making Moffitt immediately suspicious that Stukey could offer him more drugs. And Moffitt's interest in the robbery persisted after Stukey corrected Revis's statement and told them the stash house contained in excess of five kilograms. There was no hesitation on Moffitt's part about the quantity being beyond his predisposition. On the contrary, he acknowledged that the opportunity was a "blessing." Gov't Ex. 8 at 4:40. These statements demonstrate Moffitt was not a hesitant member of the conspiracy, and that he was ready and eager to steal eight to twelve kilograms of cocaine. In other words, the facts of this case do not support a sentencing entrapment defense.

Second, making a sentencing entrapment defense would have been inconsistent with his trial counsel's strategy. Throughout the case, Moffitt argued he was innocent and lacked conspiratorial intent. When Moffitt took the stand, he testified he was just "playing along" with the stash house conspiracy and that he was innocent of the charges; he never mentioned anything suggestive of entrapment. His trial counsel never mentioned any sort of entrapment in his opening statement, cross-examination of the government's witnesses, direct examination of Moffitt himself, or his closing argument. Moffitt's trial strategy was focused entirely on his innocence. Moffitt's trial counsel recognized that advancing a traditional entrapment defense stood in some tension with his innocence strategy, and he suggested to the district judge that Moffitt might not even want that instruction, though it was requested and ultimately given. Advancing a sentencing entrapment defense would have been an even more awkward fit with Moffitt's trial strategy, because it would have required conceding some culpability. Throughout the trial, Moffitt demonstrated he was not willing to do this, insisting he was innocent altogether.

Third, the quantity of drugs proffered by law enforcement in this case would not make out a sentencing entrapment defense in some circuits. In this case, there is testimony that the quantity of drugs chosen, eight to twelve kilograms, was based on law enforcement's understanding of what a typical stash house in the Pittsburgh area would contain. At no time during the trial, or on appeal, has Moffitt contended that this is not the typical amount of drugs found in a Pittsburgh stash house. Among the circuits that do recognize a sentencing entrapment defense, some authority finds it inapplicable if law

enforcement invents an amount of drugs that is found in a typical stash house in the area. For example, the Seventh Circuit held that, unless there are other facts suggesting coercion, it will not find sentencing entrapment where law enforcement invents a quantity of drugs that would be typically found in local stash houses. *See Mayfield*, 771 F.3d at 422, 441 (stating that an amount less than twenty kilograms of cocaine is typical in the relevant locality); *see also United States v. Hare*, 820 F.3d 93, 103 (4th Cir. 2016) (stating, in the context of a due process claim, that "15 to 20 kilograms of cocaine" is not an "outrageous . . . inducement"). Stated differently, it is not an "illegitimate inducement" if law enforcement creates a sting involving enough drugs to constitute a "typical stash-house robbery." *Id.* at 441. The idea behind this rationale is that the sting would be less likely to work if law enforcement were to choose an artificially low amount of cocaine.

Because we conclude that Moffitt suffered no prejudice from his trial counsel's failure to raise a sentencing entrapment defense before the jury, it is unnecessary to decide whether his counsel rendered deficient assistance of counsel.

**B.**

Moffitt's attack on sentencing counsel's performance fares no better. Moffitt cannot establish prejudice at sentencing because, even if counsel had raised a sentencing entrapment defense, there is no reasonable probability that his sentence would have been different.

As noted, a jury convicted Moffitt of conspiracy to possess with intent to distribute, and attempting to possess and distribute, five kilograms or more of cocaine. Both the verdict and the government's 851 notice required the trial court to impose a life

15

sentence. There is no reasonable probability the outcome would have been different if Moffitt's counsel had asserted a sentencing entrapment defense under these circumstances.

In reviewing Moffitt's ineffective assistance claims, we must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689. Here, the facts do not support a sentencing entrapment defense at trial or at sentencing. Accordingly, trial counsel and sentencing counsel were not constitutionally ineffective.

\*     \*     \*

Moffitt did not receive ineffective assistance of counsel at his trial or sentencing. Although his statutorily-mandated life sentence is harsh, and we have continued concerns about reverse sting operations by law enforcement, this case does not turn on those issues.

## V.

For the foregoing reasons, we will affirm the trial court's order denying Moffitt's motion.